## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARK A. BRUCE,

                       **Plaintiff,**

v.

LAURA KELLY, Governor of the
State of Kansas; WILL
LAWRENCE, Chief of Staff for
Governor Kelly; and HERMAN T.
JONES, Superintendent of the
Kansas Highway Patrol,

                       **Defendants**.

                      Case No. 20-4077-DDC

## MEMORANDUM AND ORDER

Plaintiff Mark A. Bruce served as Superintendent of the Kansas Highway Patrol (KHP), an unclassified, at-will position. The Kansas Governor, defendant Laura Kelly, decided to make a change in KHP's leadership. She tasked her Chief of Staff, defendant Will Lawrence, to effectuate this change. Chief of Staff Lawrence met with plaintiff and asked him to resign. Governor Kelly then appointed defendant Herman T. Jones as KHP's Superintendent. Plaintiff resigned and subsequently retired from the KHP. Plaintiff brings this suit against Governor Kelly and Superintendent Jones in their official capacities, claiming they violated his due process rights. He also sued Chief of Staff Lawrence in his individual capacity for violating plaintiff's due process rights and tortiously interfering with plaintiff's business relationship with the state of Kansas. Doc. 1. While the Governor may terminate the KHP Superintendent as an at-will employee, a Kansas statute provides that the Superintendent, if terminated, may return to the

position he held before Superintendent.  Kan. Stat. Ann. § 74-2113.  And plaintiff previously served as a KHP Major, a classified position with employment protections.  So, plaintiff maintains that defendants unconstitutionally deprived him of a property interest—returning to Major—when they terminated him without due process of law.  Plaintiff also claims that Chief of Staff Lawrence tortiously interfered with his business relationship.  Defendants move for summary judgment against all claims, arguing that no reasonable factfinder could conclude that they violated plaintiff's due process rights or tortiously interfered with plaintiff's business relations because plaintiff voluntarily resigned.  Doc. 38.  Defendants also ask the court to grant Chief of Staff Lawrence qualified immunity on the due process claim.  *Id.*

For reasons explained below, the court denies defendants' request for summary judgment on Count I, plaintiff's claims that Governor Kelly and Superintendent Jones violated plaintiff's due process rights.  The court grants Chief of Staff Lawrence qualified immunity against plaintiff's due process claim and thus grants summary judgment against Count II on that basis. The court also grants summary judgment for Chief of Staff Lawrence on Count III, plaintiff's tortious interference claim.

## I.      Alleged Sham Declaration

Before reciting the summary judgment facts relevant to the pending motion, the court addresses defendants' reply argument that plaintiff's response improperly relies on a sham declaration.  Doc. 40.  Plaintiff asks the court for leave to file a sur-reply addressing defendants' argument.  Doc. 41.  The court first considers plaintiff's sur-reply request, then evaluates the merits of defendants' argument that the contested declaration is a sham.

### A.      Plaintiff's Sur-reply

Plaintiff's response relies on facts from plaintiff's attached second declaration.  Doc. 39; Doc. 39-1 at 4–5 (Pl. Second Decl.).  Defendants, in their reply, argue that plaintiff's second

declaration is a sham and thus ask the court to disregard statements made there.  Doc. 40 at 5.

Plaintiff moves to file a sur-reply to respond to defendants' sham declaration argument.  Doc. 41.

The legal standard for sur-replies follows.

Sur-replies are permitted only with leave of court and under "rare circumstances" after a

showing of good cause.  *Humphries v. Williams Nat. Gas Co.*, No. 96-4196-SAC, 1998 WL

982903, at *1 (D. Kan. Sept. 23, 1998) (citations and internal quotation marks omitted).  For

example, when a moving party uses their reply to present new material—*i.e.*, new evidence or

new legal arguments—and if the court elects to rely on that new material, it should give the non-

moving party an opportunity to respond.  *See Green v. New Mexico*, 420 F.3d 1189, 1196 (10th

Cir. 2005).  These rules governing sur-replies are based on common sense.  They "are not only

fair and reasonable, but they assist the court in defining when briefed matters are finally

submitted and in minimizing the battles over which side should have the last word."  *Humphries*,

1998 WL 982903, at *1 (citation and internal quotation marks omitted).  The court now applies

these common sense rules to plaintiff's request.

Here, the court concludes that a sur-reply is warranted.  Defendants' reply introduces a

new legal argument—that plaintiff's second declaration is a sham.  Doc. 40.  Fairness and reason

favor granting plaintiff's request to rebut defendants' attack.  The court thus grants plaintiff's

Motion for Leave to File a Sur-Reply (Doc. 41) and considers the substance of his sur-reply.

Now, the court decides the merits of defendants' sham declaration argument.

### B.      Plaintiff's Second Declaration

Defendants contest two specific paragraphs in plaintiff's second declaration.  They argue

that those paragraphs are sham testimony that the court shouldn't consider.  The court addresses

each paragraph individually, below, ignoring the uncontested paragraphs.  But, first, the court

recites the legal standard governing sham declarations.

Courts perform a two-step analysis to determine if a declaration is a sham. [1]  At step one, courts compare the new declaration to the previous testimony and determine if the new declaration makes a material change.  *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) ("[C]ourts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue.").  "A change is material if it bears on an essential element of a claim or defense."  *Summerhouse v. HCA Health Servs. of Kan.*, 216 F.R.D. 502, 508 (D. Kan. 2003) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).  If the court determines that the new declaration doesn't make a material difference, the court's inquiry ends. But if the new declaration does make a material difference, the court proceeds to step two.  On step two, the court must discern whether the new declaration "constitutes an attempt to create a sham fact issue."  *Franks*, 796 F.2d at 1237.  To determine whether the new declaration is permissible or whether it's a sham, the Tenth Circuit relies on three factors:

1. "[W]hether the [declarant] was cross-examined during his earlier testimony,"

2. "[W]hether the [declarant] had access to the pertinent evidence at the time of his earlier testimony or whether the [declaration] was based on newly discovered evidence, and"

3. "[W]hether the earlier testimony reflects confusion which the [declaration] attempts to explain."

*Id.*  The court applies the sham declaration standard to both paragraphs challenged by defendants' argument.

---

[1]     The same standard applies to sham affidavits and sham declarations.  *See Stuckens v. SAGE Dining Servs., Inc.*, No. 22-1171, 2023 WL 2945861, at *3 n.3 (10th Cir. Apr. 14, 2023) ("Under 28 U.S.C. § 1746, an unsworn declaration submitted under penalty of perjury is deemed to have the same force and effect as a sworn affidavit."); *Davani v. Travelers Pers. Ins. Co.*, No. CV 22-1244-KHV, 2023 WL 7091344, at *2 n.4 (D. Kan. Oct. 26, 2023) (applying the sham affidavit standard to a declaration).

### 1.  Paragraph Three

Defendants argue that paragraph three of plaintiff's second declaration changes his testimony about how long the March 28, 2019, meeting lasted.  During his deposition under oath, plaintiff testified that his March 28, 2019, meeting with Chief of Staff Lawrence lasted "45 minutes . . . Maybe 30 minutes.  Maybe not even 30 minutes."  Doc. 38-18 at 16 (Pl. Dep. 62:21–24).  In contrast, paragraph three of plaintiff's second declaration asserts that Chief of Staff Lawrence "did not give [him] any time to decide whether or not to resign.  [He] believed that [he] had to make [his] decision during the meeting[.]"  Doc. 39-1 at 4 (Pl. Second Decl. ¶ 3).  Plaintiff's second declaration controverts his deposition testimony about the length of the meeting.  *Id.*; Doc. 39 at 5.

This change, though subtle, is material.  Plaintiff's new declaration undermines defendants' summary judgment argument and influences the court's legal analysis.  Defendants' central summary judgment argument—that plaintiff voluntarily resigned—relies on how long the meeting lasted.  Defendants argue that plaintiff's deposition testimony demonstrates that Chief of Staff Lawrence didn't coerce plaintiff to resign; he had plenty of time during the meeting to ask questions and discuss alternatives.  Doc. 38 at 11.  The length of the meeting also matters because it's one element of a test the court uses to determine whether plaintiff voluntarily resigned or was coerced into doing so.  Plaintiff's second declaration thus differs—and materially so—from his deposition testimony.

To determine whether the material change to the deposition testimony is a sham, the court applies the three *Franks* factors.  For reasons explained in the following paragraphs, the court concludes that all three factors favor excluding the second declaration's changes to plaintiff's deposition testimony.

*First*, plaintiff concedes that he was cross-examined during his deposition.  Doc. 41-1 at 2.[2]  This factor thus favors excluding the second declaration as a sham.

*Second*, plaintiff admits that his changes to the deposition testimony aren't based on newly discovered evidence.  *Id.*  This factor this favors exclusion, as well.

*Third*, none of the original testimony reflects confusion which the second declaration attempts to rectify.  Instead, the changes the second declaration makes to plaintiff's deposition testimony provide new facts that controvert the original testimony.  And plaintiff offers no explanation why he didn't provide evidence that Chief of Staff Lawrence "did not give [him] any time to decide whether to resign" in his first declaration or during his deposition.  Plaintiff "had every reason to disclose the information earlier, so the last-minute [declaration] should at least explain the failure."  *Genberg v. Porter*, 882 F.3d 1249, 1263 (10th Cir. 2018) (Hartz, J., concurring in part and dissenting in part) (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1223–24 n.3 (10th Cir. 2000) (finding plaintiff's affidavit a sham affidavit when it didn't "attempt to clarify confusing testimony given during the deposition")); *Franks*, 796 F.2d at 1237 (finding plaintiff's affidavit a sham affidavit when it made "no reference to [plaintiff's] earlier contrary statements, and his earlier testimony [was] unequivocal").  This factor also favors exclusion.

Altogether, the three *Franks* factors weigh against considering this part of plaintiff's second declaration.  The court thus disregards plaintiff's sham testimony in the third paragraph

---

[2]  Plaintiff argues that he wasn't cross examined about the statements in his second declaration because "most of" those statements "were included in his first declaration[.]"  *Id.*  But this explanation fails for two reasons. *First*, plaintiff's first declaration doesn't include the evidence from paragraph three of his second declaration.  So, it's no surprise plaintiff wasn't cross-examined during his deposition about evidence he first introduced months later.  And *second*, even if one could tie plaintiff's new evidence to a statement in his first declaration, plaintiff offers no reason why he wasn't cross examined about his statements in that first declaration.  After all, the first declaration was an exhibit to the deposition.  And during the deposition plaintiff reaffirmed his statements from his first declaration.

of his second declaration.  The court now turns to the second paragraph challenged by defendants.

### 2.  Paragraph Five

Defendants argue that paragraph five of plaintiff's second declaration changes his testimony about whether he voluntarily resigned.  Not so.  Plaintiff's first declaration repeats the challenged declaration almost verbatim.  Doc. 38-2 at 4 (Pl. Decl. ¶ 11).  And plaintiff adopted his first declaration during his deposition, under oath.  *See* Doc. 38-18 at 4–5 (Pl. Dep. 16:22–17:11).  So, plaintiff's testimony in paragraph five didn't change his testimony in his first declaration or deposition.  The court thus considers the content of paragraph five in plaintiff's second declaration as part of the summary judgment evidence.

In sum, the court disregards paragraph three of plaintiff's second declaration as sham testimony.  The remaining paragraphs in plaintiff's second declaration stand.  Having decided which evidence it will consider at summary judgment, the court summarizes the summary judgment facts controlling defendants' summary judgment motion.

## II.      Background

The following facts either are stipulated in the Pretrial Order (Doc. 37), uncontroverted, or where genuinely controverted, viewed in the light most favorable to plaintiff—the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

Plaintiff worked for the Kansas Highway Patrol for 30 years before retiring in 2019. Doc. 38-2 at 1 (Pl. Decl. ¶¶ 2–3).  Plaintiff's retirement followed his promotion from Major to Superintendent, his subsequent change in employment status, and ultimately, his request to resign.  *Id.* at 1–5 (Pl. Decl. ¶¶ 3, 8–12).  The court first explains KHP's organizational structure, then plaintiff's pathway to the Superintendent position, and finally, plaintiff's departure from KHP.

### *Kansas Highway Patrol Background*

The Kansas Highway Patrol is an agency of the State of Kansas that enforces traffic, criminal, and other laws throughout Kansas.  Kan. Stat. Ann. § 74-2105.  KHP is a para-military organization and structured in a similarly hierarchal manner.  Doc. 38-2 at 2 (Pl. Decl. ¶ 4).  Employees must serve a minimum time in one position before becoming eligible to move to the next rank.  *Id.*

The Kansas Civil Service Act (KCSA) governs KHP and it designates two classes of employees:  classified and unclassified.  Kan. Stat. Ann. § 75-2935.  An employee qualifies as "unclassified" if a statute designates the employee unclassified.  Employees are classified by default.  *Id.*  Classified employees first must serve a probationary period—during which time their employer may terminate them at-will—before achieving permanent status.  Doc. 37 at 2 (Pretrial Order ¶ 2.a.vi.).  Permanent, classified employees enjoy employment protections.  That is, an employer only may dismiss, demote, or suspend a classified employee for valid cause after following various procedural and substantive safeguards (*i.e.*, prior notice, written statement explaining reasons for intended action).  Kan. Stat. Ann. § 75-2949d.

Conversely, unclassified employees serve at the pleasure of their appointing authority, who may terminate them at-will.  Doc. 37 at 3 (Pretrial Order ¶ 2.a.ix.).  Relevant here under the KCSA, the Kansas Governor may appoint a KHP Superintendent and terminate the Superintendent at-will.  Kan. Stat. Ann. § 74-2113.  The KHP Superintendent thus qualifies as an unclassified employee.  If the governor terminates a Superintendent, Kansas law requires that the Superintendent return to the rank that the Superintendent held before appointment to the Superintendent position.  *Id.*

### *Plaintiff's Path to Superintendent*

Plaintiff began working for KHP in 1989 as a Trooper.  Doc. 38-2 at 1 (Pl. Decl. ¶ 3).

During his 30 years of service, plaintiff earned a master's degree in criminal justice

administration.  Doc. 38-18 at 2 (Pl. Dep. 7:8–13).  Plaintiff moved up through KHP classified

positions:  from Trooper, to Trooper II, then Sergeant, Second Lieutenant, Lieutenant, Captain,

and Major.  Doc. 38-1 at 1 (Pl. Decl. ¶ 3).  In 2015, then-Kansas Governor, Sam Brownback,

appointed plaintiff as KHP Superintendent.  Doc. 38-2 at 3 (Pl. Decl. ¶ 8).  Plaintiff accepted this

appointment, understanding that he would serve at the pleasure of the governor, but knowing that

he could return to his classified Major position if terminated as Superintendent.  *Id.*; Doc. 38-18

(Pl. Dep. 19:16–21).  The Kansas Senate approved plaintiff's appointment and he began serving

as Superintendent.  Doc. 38-5 at 2 (Kansas Senate Confirmation Vote).

### *Governor Kelly & Chief of Staff Lawrence*

In 2018, Governor Brownback resigned, succeeded by Jeff Colyer, Brownback's

lieutenant governor.  Doc. 38-18 at 11, 21 (Pl. Dep. 44:10–25, 81:18–21).  In 2019, Governor

Kelly became Kansas's Governor and holds that position today.  Doc. 37 at 2 (Pretrial Order

¶ 2.a.ii.).  Defendant Will Lawrence is the Chief of Staff for Governor Kelly.  *Id.*  Chief of Staff

Lawrence manages the staff in the Governor's office in all areas including legislative,

appointments, constituent services, scheduling, cabinet affairs, and legal matters.  Doc. 38-19 at

2 (Lawrence Dep. 6:6–20).  The Cabinet reports to the Governor but the Chief of Staff acts as a

liaison between the Cabinet and the Governor.  *Id.*  Chief of Staff Lawrence manages much of

the daily interaction with the Cabinet and executes the Governor's priorities as she

communicates them.  *Id.*

One of those priorities:  a change in KHP leadership.  About seven to ten days before

March 28, 2019, Governor Kelly told Chief of Staff Lawrence that she wanted to make a change

in the KHP's leadership.  Doc. 38-19 at 10 (Lawrence Dep. 39:15–40:19).  Governor Kelly provided Chief of Staff Lawrence "a lot of latitude" to implement this change in leadership.  *Id.* at 10–11 (Lawrence Dep. 40:21–41:1).

### *Plaintiff's Resignation*

On March 28, 2019, Chief of Staff Lawrence summoned plaintiff to his office for a meeting.  Doc. 38-2 at 3 (Pl. Decl. ¶ 9).  During the meeting, Chief of Staff Lawrence told plaintiff that "we need you to resign" and that Governor Kelly wouldn't retain him as Superintendent.  *Id.*; Doc. 38-18 at 12 (Pl. Dep. 47:18–22).  Plaintiff had no warning that Chief of Staff Lawrence wanted plaintiff to resign.  Doc. 38-18 at 19 (Pl. Dep. 74:6–11).  Chief of Staff Lawrence's request for plaintiff to resign left him "flabbergasted."  *Id.* at 12 (Pl. Dep. 48:5–6).

The March 28 meeting lasted about 15–45 minutes.  *Id.* at 16 (Pl. Dep. 62:18–24); Doc. 39-19 at 13 (Lawrence Dep. 50:25–51:2).  Plaintiff ultimately told Chief of Staff Lawrence that he would resign.  Doc. 38-2 at 3 (Pl. Decl. ¶ 9).  Chief of Staff Lawrence brought with him both a resignation letter and a termination letter.  Doc. 38-19 at 14 (Lawrence Dep. 53:7–10); Doc. 38-11 (Unsigned Termination Letter).  Chief of Staff Lawrence never showed plaintiff the termination letter.  Doc. 38-18 at 16 (Pl. Dep. 61:7–13).  He handed plaintiff a pre-prepared resignation letter with a statement about plaintiff's effective resignation date.  Doc. 38-7 (Unsigned Resignation Letter); Doc. 38-2 at 3 (Pl. Decl. ¶ 9); Doc. 38-18 at 13 (Pl. Dep. 50:8–51:16).  Plaintiff asked Chief of Staff Lawrence to change the effective resignation date on the letter from April 6 to April 8, a change that yielded additional retirement payments for plaintiff.  Doc. 38-18 at 13 (Pl. Dep. 50:8–51:16); Doc. 38-19 at 16 (Lawrence Dep. 62:12–63:15).  Chief of Staff Lawrence agreed to plaintiff's request, crossed out the 6, and replaced it with an 8 in handwriting.  Doc. 38-19 at 16 (Lawrence Dep. 63:2–15).  Plaintiff then signed the resignation letter.  *See* Doc. 38-12 (Signed Resignation Letter).  Chief of Staff Lawrence then gave plaintiff

a letter accepting plaintiff's resignation and placing him on administrative leave until April 8. Doc. 38-14 (Signed Resignation Acceptance); Doc. 38-18 at 17 (Pl. Dep. 68:5–10).

Based on plaintiff's March 28 conversation with Chief of Staff Lawrence and the language of the Chief of Staff's letter, plaintiff understood and believed that Governor Kelly had dismissed him from all employment with the KHP. Doc. 38-2 at 4 (Pl. Decl. ¶ 11). Consequently, the day after the meeting, plaintiff emailed Chief of Staff Lawrence about retiring from the KHP. *Id.* Plaintiff initiated these communications because he "understood and believed that [he] had no other choice but to retire from the KHP." *Id.* On April 2, 2019, plaintiff submitted a retirement letter to Governor Kelly and Chief of Staff Lawrence. *Id.* at 5 (Pl. Decl. ¶ 12); Doc. 38-15 (Pl. Retirement Letter). Defendant Herman T. Jones replaced plaintiff as KHP Superintendent and served in that role for about four years. Doc. 37 at 2 (Pretrial Order ¶ 2.a.iv.).[3]

Plaintiff and defendants adduce conflicting facts about three critical details of the meeting: (1) the reasons Chief of Staff Lawrence told plaintiff had led to his requested resignation; (2) whether Chief of Staff Lawrence told plaintiff that he had the option to return to his former position with KHP, as a classified Major; and (3) whether Chief of Staff Lawrence showed plaintiff a document explaining how plaintiff's choice to return to Major would affect plaintiff's sick leave and vacation leave payouts. The court recounts each party's perspective but, ultimately, adopts the version of these events most favorable to plaintiff to analyze defendants' summary judgment motion. *See Scott*, 550 U.S. at 378–80.

---

[3]     While the parties' filings don't reflect any change, media reports suggest that Superintendent Jones resigned that position on July 1, 2023. This transition, if correctly reported, doesn't matter because plaintiff sues Mr. Jones only in his official capacity. So, if someone else now serves as KHP Superintendent, that person would replace Mr. Jones under Fed. R. Civ. P. 25(d).

*First*, plaintiff asserts that Chief of Staff Lawrence told plaintiff that Governor Kelly wanted plaintiff to resign because of "the Randy Moon thing"[4] and management issues.  Doc. 83-18 at 12 (Pl. Dep. 47:20–22).  Plaintiff maintains that Chief of Staff Lawrence discussed just one management issue at the meeting:  a budget disagreement between plaintiff and Governor Kelly about KHP aircraft.  *Id.* at 12–13 (Pl. Dep. 48:7–20; 50:5–8).  Plaintiff asserts that Chief of Staff Lawrence never raised issues about plaintiff's KBI background check.  Doc. 39-1 at 4 (Pl. Second Decl. ¶ 2).  Defendants remember things differently.  While Chief of Staff Lawrence agrees that he mentioned Randy Moon and the aircraft budget issue, he insists that he also discussed "the general counsel situation" and issues with plaintiff's KBI background check.  Doc. 38-19 at 14 (Lawrence Dep. 56:15–23).  In short, plaintiff and defendants disagree about the reasons Chief of Staff Lawrence provided plaintiff to explain Governor Kelly's request for his resignation.

*Second*, plaintiff asserts that Chief of Staff Lawrence didn't tell plaintiff he had the option to return to his former position as Major, a classified job.  Doc. 38-2 at 4 (Pl. Decl. ¶ 11); Doc. 38-18 at 16 (Pl. Dep. 63:21–64:6).  Again, defendants disagree.  They assert that Chief of Staff Lawrence presented plaintiff the option to return to Major following his removal as Superintendent.  Doc. 39-1 at 2 (Lawrence Decl. ¶ 5).

And *third*, plaintiff maintains that Chief of Staff Lawrence didn't show him a document outlining the difference in payouts for sick and vacation leave during the meeting, comparing what plaintiff would receive if he resigned or, instead, forced Chief of Staff Lawrence to terminate him.  Doc. 38-2 at 4 (Pl. Decl. ¶ 11).  Following the pattern, defendants disagree.  They

---

[4]     The Superintendent may appoint an Assistant Superintendent under Kan. Stat. Ann. § 74-2113(a). Plaintiff appointed Randy Moon to the Assistant Superintendent position.  Doc. 38-18 at 4 (Pl. Dep. 16:18–21).

emphasize that Chief of Staff Lawrence showed plaintiff a document about sick and vacation leave payouts and discussed how plaintiff would receive an additional $5,000 in payouts if he resigned, instead of returning to the Major Position.  Doc. 39-1 at 2–3 (Lawrence Decl. ¶ 6); Doc. 38-9 (Salary-Retirement Implications).

On November 23, 2020, plaintiff brought this suit against Governor Kelly, Superintendent Jones, and Chief of Staff Lawrence.[5]  Doc. 1.

## III.      Legal Standard

Under Fed. R. Civ. P. 56(a), a party may move for summary judgment by "identifying each claim . . . on which summary judgment is sought" and showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also In re Aluminum Phosphide Antitrust Litig.*, 905 F. Supp. 1457, 1460 (D. Kan. 1995).  When it applies this standard, the court "view[s] the evidence and make[s] inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of

---

[5]      Plaintiff originally sued Superintendent Jones in his individual capacity, as well, accusing him of violating plaintiff's First Amendment free speech rights.  Doc. 1.  The court dismissed the claim against Superintendent Jones in his individual capacity on qualified immunity grounds.  Doc. 22.

law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citation and internal quotation marks omitted). To shoulder this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (citation and internal quotation marks omitted).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671. "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). To survive summary judgment, the non-moving party's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.*

Finally, summary judgment isn't a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it serves an important procedural role, "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

IV.     **Analysis**

Plaintiff asserts three claims. Count I asserts a § 1983 claim against Governor Kelly and Herman Jones in their official capacities. It claims they violated plaintiff's due process rights. Doc. 37 at 9 (Pretrial Order ¶ 4.a.i.). This claim asserts that Governor Kelly, acting through Chief of Staff Lawrence, coerced plaintiff to resign as Superintendent, thus constructively terminating him. Plaintiff argues that when Governor Kelly, acting through Chief of Staff Lawrence, coerced him to resign and failed to provide plaintiff the option to return to Major,

Governor Kelly thus deprived plaintiff of his property interest in continued employment with the State of Kansas, all without due process. Count II asserts a § 1983 claim against Chief of Staff Lawrence in his individual capacity. This claim asserts that Chief of Staff Lawrence violated plaintiff's due process rights. *Id.* (Pretrial Order ¶ 4.a.ii.). Count III is a state law claim against Chief of Staff Lawrence acting in his individual capacity. It claims tortious interference with a prospective business relationship. *Id.* (Pretrial Order ¶ 4.a.iii.). Plaintiff argues that Chief of Staff Lawrence tortiously interfered with plaintiff's business relationship with the State of Kansas when he terminated plaintiff's employment and didn't offer him the option to return to Major.

Defendants move for summary judgment on all claims. For the due process claims in Count I and Count II, defendants argue that plaintiff voluntarily resigned, thus forfeiting his due process rights. And in any event, defendants argue, they gave plaintiff all the process he was due. On Count II, defendants assert that Chief of Staff Lawrence is entitled to qualified immunity. And on Count III, defendants maintain that Chief of Staff Lawrence couldn't have tortiously interfered with plaintiff's business relationship with the State of Kansas because a tortious interference claim requires a third party. Putting it differently, as a matter of law, the State of Kansas can't interfere with plaintiff's future relationship with the State.

The court begins with the issue whether plaintiff voluntarily resigned or, instead, if Governor Kelly, acting through Chief of Staff Lawrence, coerced him to resign.

A.      **Voluntary vs. Coerced Resignation (Count I)**

"[I]f an employee voluntarily relinquishes a property interest, then no procedural due process violation has occurred." *Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 564 (10th Cir. 2010) (citations and internal quotation marks omitted). Defendants argue that plaintiff is owed no due process because he voluntarily resigned and waived any due process

rights guaranteed by Kan. Stat. Ann. § 74-2113.  Though plaintiff concedes that he resigned, he

argues, in response, that Governor Kelly, acting through Chief of Staff Lawrence, coerced him

into resigning—effectively terminating plaintiff and triggering Kan. Stat. Ann. § 74-2113's due

process protections.  The court recites the legal standard governing voluntary resignations, then

applies that standard to determine whether, for summary judgment purposes, it's undisputed that

plaintiff voluntarily resigned.  In sum, has plaintiff adduced admissible evidence that could

permit a reasonable jury to find that Governor Kelly, acting through Chief of Staff Lawrence,

coerced plaintiff into resigning?

Our Circuit explains that when an employee's "resignation was so involuntary it

amounted to a constructive discharge, defendants did deprive [him] of [his] property interest

without due process." *Parker*, 981 F.2d at 1162 (citing *Stone v. Univ. of Md. Med. Sys. Corp.*,

855 F.2d 167, 173 (4th Cir. 1988)).  "A resignation will be involuntary and coerced when the

totality of the circumstances indicate the employee did not have the opportunity to make a free

choice." *Id.* (citing *Stone*, 855 F.2d at 174).

The Tenth Circuit has articulated four factors that control the decision whether a

resignation amounts to an involuntary constructive discharge:

> "(1) whether the employee was given some alternative to resignation; (2)
> whether the employee understood the nature of the choice he was given; (3)
> whether the employee was given a reasonable time in which to choose; and
> (4) whether he was permitted to select the effective date of resignation."

*Id.* (quoting *Stone*, 855 F.2d at 174).  Each factor weighs equally, and uses an objective standard.

*Yearous v. Niobrara Cnty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997) (citing *Parker*,

981 F.2d at 1162).  Plaintiff faces "a substantial burden" to establish constructive discharge.

*Narotzky*, 610 F.3d at 565.  "'[W]hether a constructive discharge occurred is a question of

fact[.]'"  *Id.* (quoting *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009)).

The court concludes that plaintiff has adduced admissible evidence that could permit a reasonable jury to find or infer that Governor Kelly, through Chief of Staff Lawrence, coerced plaintiff into resigning.  The court explains its conclusion, analyzing the summary judgment facts under all four of *Parker*'s factors, below.

### 1.  Alternative to Resignation

First, *Parker* considers whether Governor Kelly, through Chief of Staff Lawrence, gave plaintiff an alternative to resigning.  Plaintiff asserts that Chief of Staff Lawrence didn't discuss with him the option of returning to his former classified rank as Major or give plaintiff any other alternative to resigning.  Doc. 38-2 at 4 (Pl. Decl. ¶ 11); Doc. 38-18 at 16 (Pl. Dep. 63:21–64:6). Plaintiff "understood and believed that [he] was being dismissed from all employment with the KHP" and that he "had no other choice but to retire from the KHP."  Doc. 38-2 at 4 (Pl. Decl. ¶ 11).  But plaintiff's subjective views can't carry the day on their own.  The governing legal standard prescribes an *objective* test, asking whether "the totality of the circumstances indicate the employee did not have the opportunity to make a free choice."  *Parker*, 981 F.2d at 1162. So, the court decides whether a reasonable factfinder could infer that Chief of Staff Lawrence gave plaintiff an alternative to resigning.

Consider the following scenario based on plaintiff's evidence, accepted in the light favorable to plaintiff.  If the jury accredits this evidence, it could support a reasonable inference or finding that plaintiff had no choice but to resign.  An employee walks into his supervisor's office for a meeting about an undisclosed topic.  "[W]e need you to resign" are the first words employee hears.  Doc. 38-18 at 12 (Pl. Dep. 47:18–22).  The supervisor then pulls a pre-written resignation letter from the folder in front of him.  He slides it across his desk to employee.  The

resignation letter bears the employee's name in typeface, below a blank signature line.  The letter

has the day's date printed at the top.  *Id.* at 13 (Pl. Dep. 50:8–51:16); Doc. 38-7 (Unsigned

Resignation Letter).  The supervisor explains that he's asking for employee's resignation because

of management issues and budget issues.  Doc. 38-18 at 12–13 (Pl. Dep. 48:7–50:7).  In fact—

the supervisor says—he just really can't get past issues with employee's self-selected, second-in-

command.  *Id.* at 12 (Pl. Dep. 47:18–22).  The letter reads "resignation," yet employee doesn't

feel like supervisor has presented him with a choice.  Doc. 38-7 (Unsigned Resignation Letter);

Doc. 38-2 at 4 (Pl. Decl. ¶ 11).  Supervisor hasn't mentioned "terminate," "fire," or "dismiss,"

but the message nonetheless is clear:  "We've decided you're done here."

This scenario, which plaintiff has assembled by admissible evidence, could permit a

reasonable factfinder to conclude that "the totality of the circumstances indicate the employee

did not have the opportunity to make a free choice."  *Parker*, 981 F.2d at 1162.  So, a reasonable

factfinder could conclude that Governor Kelly, through Chief of Staff Lawrence, gave plaintiff

no option but to resign.  Defendants argue that plaintiff knew he had an alternative:  to force

Governor Kelly, through Chief of Staff Lawrence, to fire him.  And the court considers

plaintiff's knowledge merely as one piece of the of totality of the circumstances.  To be sure, no

existing legal authority at the time of the meeting required Governor Kelly, through Chief of

Staff Lawrence, to discuss alternatives with plaintiff.[6]  But viewing the facts in the light most

favorable to plaintiff, Governor Kelly, through Chief of Staff Lawrence, told plaintiff he had to

resign—plaintiff's employment was over.  The summary judgment facts thus permit an inference

---

[6]      On March 28, 2019, the Kansas Supreme Court hadn't yet interpreted Kan. Stat. Ann. § 74-2113
to entitle plaintiff to return *immediately* to the classified Major position, skipping the six-month probation
period.  *See* Doc. 27-1 at 4; *Bruce*, 514 P.3d at 1010.

that plaintiff had no choice but to agree with what Governor Kelly, through Chief of Staff Lawrence, told him: He must resign. Element one thus disfavors summary judgment.

### 2. Nature of Choice

The second *Parker* factor asks whether plaintiff "'understood the nature of the choice he was given[.]'" 981 F.2d at 1162 (quoting *Stone*, 855 F.2d at 174). This question focuses on whether defendants presented plaintiff with options to choose from, *i.e.*, resignation, termination, retirement. In other words, elements one and two overlap.

As it must at summary judgment, the court accredits plaintiff's version of the facts: Governor Kelly, through Chief of Staff Lawrence, didn't explicitly offer plaintiff a choice. Defendants argue that plaintiff still had a choice because plaintiff understood he had the option to refuse to resign and instead, forced Governor Kelly to terminate him. Doc. 38 at 11–14. And if Governor Kelly terminated him, plaintiff would return to Major. Thus—defendants reason— plaintiff understood the difference between resigning and forced termination. Two major flaws inhere within this argument.

To start, defendants' argument relies on the premise that plaintiff voluntarily resigned. But the court can't apply this premise here, on summary judgment, because the court must decide the motion based on plaintiff's version of the evidence. *Scott*, 550 U.S. at 378–80. And plaintiff's facts leave room for a jury to draw the reasonable inference that Governor Kelly didn't offer plaintiff any choice at all, as discussed above under element one.

Defendants' argument suffers a second problem. It relies on factually distinguishable case law. Defendants sidestep the four *Parker* elements, and instead rely on *Narotsky* and *Yearous*. *Narotsky*, 610 F.3d at 563, 568 (affirming lower court's grant of summary judgment for defendants based on conclusion that case's circumstances didn't constitute a constructive discharge); *Yearous*, 128 F.3d at 1352 (reversing jury verdict for plaintiffs because no reasonable

jury could conclude plaintiffs were constructively discharged).  But, the facts in *Narotsky* and *Yearous* don't resemble the facts here, when viewed in the light most favorable to plaintiff.  In neither case did defendants ask the plaintiff to resign.  *Narotsky*, 610 F.3d at 561–63; *Yearous*, 128 F.3d at 1357.  Instead, the plaintiff in each case resigned because defendants allegedly made the workplace an intolerable environment to continue working.  *Narotsky*, 610 F.3d at 563; *Yearous*, 128 F.3d at 1357.  In both cases, the Circuit concluded that plaintiffs voluntarily had resigned because they had "an alternative to resignation:  namely, continuing to work . . . and trying to resolve the problem."  *Narotsky*, 610 F.3d at 566; *see also Yearous*, 128 F.3d at 1357 ("[T]he board gave plaintiffs an alternative to resignation, namely continuing to work and attempting in good faith to resolve their problems . . . through internal procedures.").  Note that plaintiffs in *Narotsky* and *Yearous* enjoyed this unspoken, tacit option—to maintain the status quo and continue working in their current position—because defendants never asked plaintiffs to resign.  In both cases, the Circuit concluded that plaintiffs "understood quite well" their choice to resign, citing facts that plaintiffs had resigned on their own volition, without being asked.  *Narotsky*, 610 F.3d at 566; *Yearous*, 128 F.3d at 1357.  In *Yearous*, defendant even asked plaintiff to stay after plaintiff had resigned.  *Yearous*, 128 F.3d at 1355.

The summary judgment facts here don't parallel *Narotzky* or *Yearous*.  The summary judgment facts—the admissible evidence viewed in the light most favorable to plaintiff—don't establish that plaintiff had the option to remain in his current Superintendent position at the KHP instead of resigning.  So, on the summary judgment facts here, plaintiff, unlike plaintiffs in *Narotzky* and *Yearous*, didn't have the option of merely "continuing to work and attempting in good faith to resolve [his] problem[s]."  *Id.* at 1357.  Plaintiff doesn't argue that Governor Kelly made his work environment so intolerable that he felt forced to resign.  Instead, plaintiff's

version of the evidence, if accredited, could establish that Chief of Staff Lawrence, acting on behalf of Governor Kelly, called plaintiff into his office, sat him down, and said, "We need you to resign."

In other cases, the defendant/employer directly presented plaintiff with an explicit option—resign or have defendant terminate him. Defendants argue that plaintiff here had both options. For example, consider *Stone*, the seminal case from which *Parker* derives its four element test. 855 F.2d 167 (affirming lower court's grant of summary judgment for defendant/employer because the summary judgment record showed plaintiff's resignation was voluntary). There, plaintiff resigned when defendant explicitly told plaintiff that he could either resign or face removal proceedings. *Id.* at 177. The Fourth Circuit concluded that plaintiff voluntarily had resigned because, plaintiff, based on undisputed facts, understood "the nature of the charges against him. He knew what his rights were, and if he did not, he was given ample time to find out." *Id.* The Fourth Circuit reasoned that plaintiff "was not a naive intern in his first clinical assignment; he was a sophisticated and well-educated hospital administrator with over thirty years experience as a member of the medical staffs of some of the finest hospitals in the country." *Id.* In other words, the court first concluded that defendant had offered plaintiff a choice between resigning or facing removal proceedings. Then, the court broached a second inquiry and considered broader, contextual facts to evaluate whether plaintiff understood the choices defendant had offered him in the first inquiry.

Here, the analysis sticks on the first inquiry: whether Governor Kelly presented plaintiff a choice. Defendants assert that plaintiff knew he could refuse to resign as Superintendent and force Governor Kelly to remove him from that position. And, as in *Stone*, defendants reference broad, contextual facts to support their position. Doc. 38 at 12 (citing plaintiff's education,

experience, and testimony).  Perhaps that version of the facts is the one that the jury will decide

to accredit.  But the court can't adopt these contextual facts because the summary judgment

record contains admissible evidence that equally could enable a reasonable inference that

Governor Kelly didn't offer plaintiff an alternative to resigning.  So, sifting through contextual

facts to determine whether plaintiff understood a non-existent choice is a futile exercise.  The

court can't conjure something from nothing.

      To conclude, element two disfavors summary judgment.  Defendants' countervailing

arguments fail because they rely on a premise that contradicts the summary judgment version of

the facts and distinguishable case law.

      **3.    Reasonable Time**

      Third, *Parker* considers whether plaintiff had reasonable time to reach a decision.

Plaintiff testified that his meeting with Chief of Staff Lawrence lasted "45 minutes . . . Maybe

not even 30 minutes."  Doc. 38-18 at 16 (Pl. Dep. 62:18–24).  And Chief of Staff Lawrence

testified that the meeting lasted as few as "15 to 20 minutes."  Doc. 38-19 at 13 (Lawrence Dep.

50:25–51:4).  The Tenth Circuit considers anywhere from several hours to weeks a reasonable

time for an employee to decide whether to resign.  *See Cacy v. City of Chickasha, Okla*., 124

F.3d 216, No. 96-6211, 1997 WL 537864, at *3–5 (10th Cir. 1997) (concluding plaintiff

voluntarily resigned when defendant gave plaintiff "two full weeks" to resign); *Parker*, 981 F.2d

at 1162 (concluding plaintiff voluntarily resigned when defendant gave employee a week to

decide); *see also Stone*, 855 F.2d at 177 (concluding plaintiff voluntarily resigned when

defendant gave plaintiff "several hours to contact an attorney"); *Rhoades v. Oklahoma ex rel.

Stitt*, No. CIV-20-761-R, 2023 WL 2742239, at *5 (W.D. Okla. Mar. 30, 2023) (finding plaintiff

*didn't* voluntarily resign when, over the span of a telephone conversation, defendant asked

plaintiff to resign and plaintiff agreed).

Both versions of the March 28 meeting falls short of the mark.  Whether a 15-minute meeting (as Chief of Staff Lawrence characterized it) or a 45-minute meeting (as plaintiff described it), the facts don't supply the weeks or hours that the Tenth Circuit has considered "reasonable."  *Cacy*, 1997 WL 537864, at *3–5; *Parker*, 981 F.2d at 1159; *see also Stone*, 855 F.2d at 167.  At bottom, a plaintiff-friendly view of the evidence could support a reasonable inference that Governor Kelly, acting through Chief of Staff Lawrence, didn't give plaintiff a reasonable amount of time to reach a decision.  Element three also disfavors summary judgment. The court now turns to the last *Parker* element.

### 4.    Selecting Date of Resignation

Fourth, *Parker* asks whether Governor Kelly, through Chief of Staff Lawrence, permitted plaintiff to select his effective date of resignation.  Plaintiff asked Chief of Staff Lawrence to change the effective date of his resignation from April 6 to April 8, thus maximizing plaintiff's retirement benefits.  Doc. 38-18 at 13 (Pl. Dep. 50:8–51:16); Doc. 38-19 at 16 (Lawrence Dep. 62:12–63:15).  Chief of Staff Lawrence acted on Governor Kelly's behalf and granted plaintiff's request.  He crossed out the 6 in April 6 and replaced it with a handwritten 8.  *See* Doc. 38-12 (Signed Resignation Letter).  In short, the admissible evidence, even viewed in plaintiff's favor, establishes that Governor Kelly permitted plaintiff to select his effective resignation date. Element four thus favors summary judgment.

On balance, three of the *Parker* elements support the view that plaintiff has adduced facts sufficient to support a reasonable finding that Governor Kelly coerced plaintiff into resigning. While Governor Kelly permitted plaintiff to select his resignation date, that's the only one of *Parker*'s elements that favors defendants.  The court thus holds that it cannot grant summary judgment against plaintiff because he purportedly resigned his employment and thus waived his due process rights.

Having decided that plaintiff didn't forfeit his procedural due process rights by resigning, the court next considers whether defendants provided plaintiff with adequate due process.

**B.      Due Process (Count I)**

Even if Governor Kelly coerced plaintiff to resign, defendants argue that they still deserve summary judgment because Governor Kelly provided plaintiff with adequate due process during his meeting with Chief of Staff Lawrence.  Plaintiff disagrees.  Plaintiff maintains that Governor Kelly violated his due process rights by depriving him of a property interest in continued employment with the KHP without due process of law.  Below, the court recites the legal standard governing due process claims, then applies that standard to the summary judgment facts to determine whether plaintiff has assembled a triable claim for a due process violation. But first, as a threshold matter, the court addresses the adequacy of plaintiff's due process briefing.

Defendants correctly argue that plaintiff's response to the summary judgment motion doesn't address squarely defendants' due process arguments.  Doc. 40 at 5.  The court agrees and declines, as it must, to make plaintiff's argument for him.  *See Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (declining to "search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury" when plaintiff didn't cite specific references (citation and internal quotation marks excluded)). In his response, plaintiff merely asserts that "[i]t is uncontroverted that [plaintiff] was never afforded the due process protections set forth in the Kansas Civil Service Act."  Doc. 39 at 9. That's simply wrong.

Defendants explicitly argue that Governor Kelly "afforded [plaintiff] constitutionally adequate due process prior to his resignation."  Doc. 38 at 10; *see* Doc. 40 at 5 ("[E]ven if [plaintiff] had a protected interest to which due process protections applied, [plaintiff] was

afforded an appropriate level of process."). But asserting something's so doesn't make it so. Defendants still must carry their summary judgment burden and demonstrate that the evidence, when viewed in the light most favorable to plaintiff as non-movant, can't support a reasonable finding or inference that Governor Kelly deprived plaintiff of due process. The court now evaluates whether defendants have met this burden without the benefit of meaningful response by plaintiff.

Our Circuit has explained that "'[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment.'" *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). A procedural due process claim requires a two-step inquiry: (1) "whether the plaintiff had a constitutionally protected interest[,]" and (2) "whether the process afforded was adequate to protect that interest." *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 748 (10th Cir. 2013) (citation omitted). "Whether the right to due process was violated is a mixed question of law and fact." *Manlove v. Tansy*, 981 F.2d 473, 476 (10th Cir. 1992). That is, the court ultimately determines whether defendants violated plaintiff's due process rights based on factual findings made by the factfinder. So, at summary judgment, the court's due process analysis depends on whether plaintiff has adduced sufficient facts for a reasonable factfinder to find that Governor Kelly violated plaintiff's due process rights. The court addresses each step of the due process inquiry, below.

### 1.      Property Interest in Continued Employment

The first requirement—existence of a constitutionally protected property interest—"does not arise from the Due Process Clause itself[.]" *Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1172–73 (10th Cir. 2016) (citation omitted). Instead, protected property

interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *see also Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996) ("The question whether a plaintiff had a protected property interest is determined by state law." (citing *Casias v. City of Raton*, 738 F.2d 392, 394 (10th Cir. 1984))). Thus, for "purposes of the Fourteenth Amendment's Due Process Clause, property interests must derive from some independent source, such as state law, contract, or other understandings that give rise to a claim of entitlement." *Eisenhour v. Weber Cnty.*, 744 F.3d 1220, 1232 (10th Cir. 2014) (citing *Roth*, 408 U.S. at 577).

"When a plaintiff claims a property interest in [his] job," the court must determine whether plaintiff "had 'a legitimate expectation of continued employment,' as defined by some independent source such as a contract for a fixed term or state law." *Id.* (quoting *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998)); *see also McDonald v. Wise*, 769 F.3d 1202, 1210 (10th Cir. 2014) ("A public employee has a property interest in his continued employment where 'state or local law creates a sufficient expectancy of continued employment.'" (quoting *Driggins v. City of Okla. City, Okla.*, 954 F.2d 1511, 1513 (10th Cir. 1992))). Thus, "[s]tate law determines whether a claim of entitlement to employment is sufficient." *McDonald*, 769 F.3d at 1210 (citing *Driggins*, 954 F.2d at 1513).

Here, defendants argue that plaintiff fails the first element of the due process inquiry because he lacked a property interest in his employment. Defendants assert that plaintiff had no property interest in his job as KHP Superintendent. Doc. 38 at 7. Indeed, Kan. Stat. Ann. § 74-2113(a) provides that "[t]he [KHP] superintendent . . . shall be within the unclassified service

under the Kansas civil service act" and unclassified employees lack a property interest in their at-will positions. *Stoldt v. City of Toronto*, 678 P.2d 153, 160 (Kan. 1984). But, Kansas law also provides, when the Governor terminates a KHP Superintendent, the Superintendent "shall be returned to a rank not lower than the rank the person held when appointed as superintendent[.]" Kan. Stat. Ann. § 74-2113(a). The Kansas Supreme Court has interpreted Kan. Stat. Ann. § 74-2113 to define the rank of a KHP Major as a classified position. Doc. 27-1 at 4; *Bruce*, 714 P.3d at 1010. The Kansas court also held that an employee returning to a previously-held permanent position—*i.e.*, Major—needn't serve an additional six-month, at-will probationary period before enjoying permanent status. *Id.* Defendants don't dispute this proposition—they acknowledge that if Governor Kelly dismissed plaintiff "from the position of KHP Superintendent K.S.A. 74-2113(a) would have required that [plaintiff] be returned to his previous rank." Doc. 38 at 7.

The issue of plaintiff's property interest thus turns on whether Governor Kelly terminated plaintiff's employment. As the court established in the previous section, plaintiff has adduced facts which permit a reasonable factfinder to find that Governor Kelly, acting by her Chief of Staff, coerced plaintiff to resign—*i.e.*, that Governor Kelly in effect terminated plaintiff. This finding, if it's the one that the jury were to adopt, would trigger Kan. Stat. Ann. § 74-2113. And it requires Governor Kelly to return plaintiff to the KHP rank that he enjoyed when Governor Brownback appointed him as Superintendent. Plaintiff served as Major before Governor Brownback appointed him as Superintendent. So, if Governor Kelly terminated plaintiff's term as Superintendent—as a reasonable factfinder could conclude she did—Kan. Stat. Ann. § 74-2113 entitled plaintiff to return to that rank within the KHP, a classified position with employment protection for permanent employees. The Kansas Supreme Court held that plaintiff immediately would enjoy the employment projections upon returning to Major because Kan.

Stat. Ann. § 74-2113 waives the six-month probationary period.  In sum, whether plaintiff had a property interest in continued employment with the KHP depends on a disputed question of material fact.

Having decided that "plaintiff had a constitutionally protected interest" should the factfinder decide that Governor Kelly terminated plaintiff, the court proceeds to the second element of the due process inquiry.  *Koessel*, 717 F.3d at 748.

### 2.        Sufficient Pretermination Due Process

The second prong of the due process inquiry asks whether Governor Kelly provided plaintiff adequate due process before revoking the property interest at issue.  Plaintiff's version of the admissible evidence informs the court's legal inquiry.  *See Manlove*, 981 F.2d at 476 (concluding that the due process inquiry includes mixed questions of law and fact).  Due process requires that an employer give the "tenured public employee . . . oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  *Loudermill*, 470 U.S. at 546.  "[T]he standards the Supreme Court delineated in *Loudermill* for pretermination hearings are not very stringent[.]"  *West v. Grand Cnty.*, 967 F.2d 362, 368 (10th Cir. 1992).  Indeed, our "circuit has required only the core of notice and an opportunity to be heard."  *Hulen v. Yates*, 322 F.3d 1229, 1248 (10th Cir. 2003).  To determine whether Governor Kelly has met these requirements, the Tenth Circuit examines three elements:  whether plaintiff received "1) an impartial tribunal; 2) notice of charges given a reasonable time before the hearing; and 3) a pretermination hearing except in emergency situations."  *Patrick v. Miller*, 953 F.2d 1240, 1244 (10th Cir. 1992) (citing *Miller v. City of Mission*, 705 F.2d 368, 372 (10th Cir. 1983)).  The court evaluates each element, below.

### a.     Impartial Tribunal

First, did Governor Kelly provide plaintiff an impartial tribunal?  This is a question of fact for the factfinder to decide.  "A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing."  *City of Mission*, 705 F.2d at 372 (citations omitted) (affirming lower court's conclusion that hearing was not impartial "because the hearing officer had a prejudiced mind when he went into the case" (citations and internal quotation marks omitted)).  "In this context, 'a substantial showing of personal bias is required to disqualify a hearing officer or tribunal.'"  *Bjorklund v. Miller*, 467 F. App'x 758, 766 (10th Cir. 2012) (quoting *Riggins*, 572 F.3d at 1112).  The court thus evaluates whether the evidence permits a reasonable finding that Governor Kelly, acting by Chief of Staff Lawrence, "had a prejudiced mind when he went into" the March 28 meeting.  *City of Mission*, 705 F.2d at 372 (internal quotation marks omitted).

About seven to ten days before the March 28 meeting, Governor Kelly told Chief of Staff Lawrence that she wanted "to make a change in the leadership at KHP."  Doc. 38-19 at 10 (Lawrence Dep. 39:24–40:19).  Governor Kelly granted Chief of Staff Lawrence "a lot of latitude" to effectuate this change in the KHP leadership.  *Id.* at 10–11 (Lawrence Dep. 40:21–41:1).  When Chief of Staff Lawrence and plaintiff met on March 28, Chief of Staff Lawrence brought with him both a resignation letter and a termination letter.  *Id.* at 14 (Lawrence Dep. 53:7–10); Doc. 38-11 (Unsigned Termination Letter).  These facts properly could support an inference that Governor Kelly deprived plaintiff of an impartial tribunal, even though Chief of Staff Lawrence never showed plaintiff the termination letter.  Doc. 38-18 at 16 (Pl. Dep. 61:7–13).  A reasonable factfinder could conclude from Chief of Staff Lawrence's actions that Governor Kelly already had decided to terminate plaintiff when Chief of Staff Lawrence called plaintiff in for the March 28 meeting and, therefore, had a "prejudiced mind."  Defendants fail to

demonstrate that Governor Kelly deserves summary judgment on this first element.  The court now addresses the second element.

### b.    Notice a Reasonable Time Before the Hearing

Did Governor Kelly provide plaintiff with notice of the charges against him a reasonable time before the hearing?  "Due process also requires that one be given notice of the charges against him a reasonable time before the hearing is to take place."  *City of Mission*, 705 F.2d at 372.  This is a question of fact for the factfinder to decide.  Defendants assert that Governor Kelly afforded plaintiff adequate due process because Chief of Staff Lawrence explained the reasons Governor Kelly wanted plaintiff's resignation and gave plaintiff an opportunity to share his side of the story during a face-to-face meeting.  Doc. 40 at 5.  While defendants correctly summarize the law, they incorrectly apply it to the summary judgment facts.  The court explains why the cases that defendants cite—ones where courts held that defendant had afforded adequate due process—differ from this one.

Defendants accurately recite the governing legal standard:  a defendant satisfies constitutional due process requirements when it provides plaintiff with "pretermination warnings[,] an opportunity for a face-to-face meeting with supervisors, and a conversation between an employee and his supervisor immediately prior to the employee's termination[.]"  *West*, 967 F.2d at 367 (affirming lower court's grant of summary judgment to defendant because defendant provided plaintiff adequate due process).  Defendants also rely on *Riggins v. Goodman*, 572 F.3d 1101, 1109 (10th Cir. 2009) (reversing denial of summary judgment for defendants on qualified immunity grounds because defendant provided plaintiff adequate due process) and *Hulen v. Yates*, 322 F.3d 1229, 1233 (10th Cir. 2003) (reversing trial court's grant of summary judgment for plaintiff on qualified immunity grounds because defendant provided plaintiff adequate due process).  But those holdings hinge on facts not presented here.

Start with *West*.  There, defendant met its constitutional due process burden where plaintiff "had several pretermination opportunities to discuss her potential termination[.]"  *West*, 967 F.2d at 368.  During one such opportunity—a two-hour meeting—plaintiff "learned that her job was in jeopardy" and discussed her employment rights with defendant.  *Id.*  Next, consider *Riggins*, where our Circuit concluded that defendant "more than adequately satisfied due process requirements" when defendant had used a "three-step review process" before terminating plaintiff.  *Riggins*, 572 F.3d at 1109.  Over five months, defendant presented plaintiff with "[1] written notice of the charges against him, [2] an explanation of the evidence, and [3] several opportunities to present his side of the story."  *Id.* at 1109.  And last, contrast the facts of *Hulen*.  There, defendant didn't terminate plaintiff, it involuntarily transferred plaintiff to a different department.  *Hulen*, 322 F.3d at 1233.  During the eight months before the transfer, plaintiff met with defendant twice, filed multiple complaints, and hired an attorney.  *Id.* at 1247–48.  "[T]he transfer was not a surprise."  *Id.* at 1247.

Plaintiff's version of the evidence here differs markedly from *West*, *Riggins*, and *Hulen*.  None of those plaintiffs were "fired out of the blue . . . for reasons that [they] did not know."  *West*, 967 F.2d at 368 (citation and internal quotations omitted).  In all three cases, plaintiffs conceded that defendants informed them of the reasons for their termination.  *West*, 967 F.2d at 368; *Riggins*, 572 F.3d at 1104–05; *Hulen*, 322 F.3d at 1233.  And in each case, defendants provided plaintiffs with advance notice and several opportunities to present their side of the story.  *West*, 967 F.2d at 365; *Riggins*, 572 F.3d at 1105–07; *Hulen*, 322 F.3d at 1233–35.  In *Riggins* and *Hulen*, plaintiffs had multiple months to meet with defendants and challenge the charges against them.  *Riggins*, 572 F.3d at 1105–06; *Hulen*, 322 F.3d at 1245.  And even in

*West*, plaintiff had multiple meetings with defendant before termination—one lasting two hours. *West*, 967 F.2d at 368.

Here, plaintiff had just one meeting with Chief of Staff Lawrence, appearing on Governor Kelly's behalf.  Doc. 38-2 at 3 (Pl. Decl. ¶ 9).  And the meeting lasted a mere 15-to-45 minutes. Doc. 38-18 at 16 (Pl. Dep. 62:18–24); Doc. 38-19 at 13 (Lawrence Dep. 50:25–51:4).  To be sure, *West* noted that a "brief face-to-face meeting with a superior provides sufficient notice and opportunity to be heard to satisfy the pretermination due process requirements of *Loudermill*." 967 F.2d at 368.  But plaintiff here didn't have the multi-month, or even multi-hour notice that defendants provided plaintiffs in *West*, *Riggins*, and *Hulen*.  Instead, plaintiff's first notice came from Chief of Staff Lawrence's statement at the beginning of their lone meeting:  "We need you to resign."  Plaintiff felt "flabbergasted" and he had "no idea what was about to transpire."  *Id.* at 12 (Pl. Dep. 48:5–6).  He had "absolute[ly] no warning." *Id.* at 19 (Pl. Dep. 74:6–11).

The parties also disagree about the reasons Chief of Staff Lawrence offered plaintiff to explain why Governor Kelly requested plaintiff's resignation.  *See Id.* at 12–13 (Pl. Dep. 48:7– 20; 50:5–8); Doc. 39-1 at 4 (Pl. Second Decl. ¶ 2); Doc. 38-19 at 14 (Lawrence Dep. 56:15–23). Chief of Staff Lawrence testified that he asked for plaintiff's resignation because of "the Randy Moon situation," "the general counsel situation," budget issues, and issues with plaintiff's KBI background check.  But plaintiff asserts that Chief of Staff Lawrence never mentioned the background check.  Plaintiff testified that Chief of Staff Lawrence cited only "the Randy Moon thing" and management issues involving the budget.  Their disagreement creates a genuine issue of material fact whether Governor Kelly provided plaintiff with reasons for his termination and an opportunity to refute those reasons.

In short, plaintiff's version of the evidence doesn't mimic *West*, *Riggins*, or *Hulen*. Instead, this version of the facts could support a reasonable inference that Governor Kelly didn't provide plaintiff with "notice of charges . . . a reasonable time before the hearing." *Patrick*, 953 F.2d at 1244. Defendants thus haven't met their burden on this second element. The court turns to the final question—whether, absent an emergency plaintiff was provided a pretermination hearing (or an "emergency" precluded such a meeting).

<b>c.      Pretermination Hearing</b>

Third, the prevailing standard asks whether Governor Kelly provided plaintiff a hearing before termination, absent emergency circumstances. This third element necessarily depends on the first two. That is, elements one and two establish *whether* Governor Kelly provided plaintiff an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Patrick*, 953 F.2d at 1244 (internal quotation marks omitted) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Element three asks *when* that opportunity occurred—before or after the termination decision. *Montgomery v. City of Ardmore*, 365 F.3d 926, 936 (10th Cir. 2004) (first citing *Hulen*, 322 F.3d at 1247; then citing *Powell v. Mikulecky*, 891 F.2d 1454, 1458 (10th Cir. 1989)).

The parties agree that Chief of Staff Lawrence and plaintiff met on March 28 and that plaintiff resigned during that meeting. And no one argues that plaintiff had a post-termination hearing. So, the parties agree. Any hearing Governor Kelly provided plaintiff would've occurred pretermination, not post-termination. The question thus, turns on whether the March 28 meeting qualifies as a pretermination hearing. Elements one and two support a reasonable conclusion that Governor Kelly didn't provide plaintiff with reasonable notice and a hearing before an impartial tribunal. Without notice and an impartial tribunal, whether Governor Kelly provided plaintiff a hearing remains a genuine issue of material fact. That is, a reasonable factfinder could find that the meeting—which kicked off with "we need you to resign"—wasn't a

33

pretermination hearing.  Defendants thus have failed to carry their summary judgment burden to show that plaintiff received a pretermination hearing.[7]  Defendants fail to meet their summary judgment burden on element three.

In sum, the summary judgment facts provide three reasons to deny summary judgment on the question whether Governor Kelly provided plaintiff with adequate due process.  Plaintiff survives summary judgment on both elements of the due process analysis.  That is, the summary judgment facts support a finding or inference that:  (1) plaintiff has a protected property interest in continued employment with KHP; and (2) Governor Kelly didn't provide plaintiff adequate pretermination due process.  Defendants' arguments—that plaintiff isn't entitled to due process, and, in the alternative, that Governor Kelly provided plaintiff adequate pretermination due process—provide no pathway to summary judgment.  The court thus denies defendants' Motion for Summary Judgment against Count I.  The court now turns to Count II and defendants' request for qualified immunity against the claim it asserts.

### C.      Qualified Immunity Against Count II

In Count II, plaintiff brings a 42 U.S.C. § 1983 claim against Chief of Staff Lawrence in his individual capacity.  This claim theorizes that Chief of Staff Lawrence violated plaintiff's due process rights.  Doc. 37 at 9 (Pretrial Order ¶ 4.a.ii.).  Defendants seek summary judgment against Count II because, they argue, Chief of Staff Lawrence is entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The qualified immunity

---

[7]      Defendants never assert that emergency circumstances excused them from giving plaintiff a pretermination hearing.

analysis has two prongs.  Plaintiff must (1) adduce facts that "make out a violation of a constitutional right," and (2) demonstrate that "the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* (citation and internal quotation marks omitted).  A court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Here, the court begins and ends its analysis with the clearly established prong.

Chief of Staff Lawrence is entitled to qualified immunity if clearly established law did not establish that his conduct—allegedly forcing plaintiff to resign without allowing him to return to the Major position—violated plaintiff's due process rights.  A "clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation and internal quotation marks omitted).  Because the clearly established prong is grounded in reasonableness, qualified "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *City of Tahlequah, Okla. v. Bond*, 595 U.S. 9, 12 (2021) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).  To qualify as clearly established, the "rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority[.]" *Wesby*, 583 U.S. 48, 63 (internal citations and quotation marks omitted).  That authority usually takes the form of case law.

Here, as the court explained in its Memorandum and Order on this case's Motion to Dismiss, plaintiff has asserted a plausible claim under *Parker*, 981 F.2d at 1162.  *Parker* stands for the proposition that when an employee's "resignation was so involuntary it amounted to a constructive discharge, defendants did deprive [him] of [a] property interest without due process."  981 F.2d at 1162 (citation omitted).  At the motion to dismiss stage, the court

previously concluded that "if plaintiff had a constitutionally protected property interest in returning to the rank of Major as a member of the classified services, then he has identified case law that clearly established a constitutional violation."  Doc. 22 at 47.

The court pauses its qualified immunity analysis briefly to discuss this Motion to Dismiss Order.  That Order certified questions to the Kansas Supreme Court.  At the time, the court couldn't tell whether Kansas law defined the rank of Major in the KHP as a classified or unclassified position.  And, if the Major position were a classified one, the court couldn't tell whether a KHP employee returning to classified service after serving as a member of the unclassified service had to serve a new six-month probationary period.  That's why, when it ruled the Motion to Dismiss, the court couldn't determine whether plaintiff had a constitutionally protected property interest in returning to the Major position.  So, the court certified these questions for the Kansas Supreme Court to answer.  That's why the court's previous qualified immunity analysis hedged its bets.  *See id.* ("[*I*]f plaintiff had a constitutionally protected property interest . . . ." (emphasis added)).

The Kansas Supreme Court now has answered the questions, holding that Kan. Stat. Ann. § 74-2113 defines Major as a classified position.  Doc. 27-1 at 4; *Bruce v. Kelly*, 514 P.2d 1007, 1010 (Kan. 2022).  It also held that a KHP employee returning to the classified service after serving as a member of the unclassified service may waive the six-month probation period and immediately enjoy the employment protections applied to classified jobs.  *Id.*  Thus, as discussed at length above, plaintiff had a property interest in returning to Major.  Now, back to the qualified immunity analysis.

Defendants have raised qualified immunity again at the summary judgment stage, arguing that plaintiff's due process rights weren't clearly established.  Plaintiff responds that the court's

Motion to Dismiss Order ends the clearly established inquiry because the Order concluded that "if plaintiff had a constitutionally protected property interest in returning to the rank of Major as a member of the classified services, then he has identified case law that clearly established a constitutional violation." Doc. 22 at 47. Now that the Kansas Supreme Court has said plaintiff had a property interest, plaintiff argues that the court can incorporate its Motion to Dismiss reasoning and call it a day.

Plaintiff's correct that, with *Parker*, he has met his burden to identify clearly established case law about the broad, federal right at issue. But that's not the end of the inquiry; plaintiff still must demonstrate that his property interest under state law was clearly established. *See Derda v. City of Brighton, Colo.*, 53 F.3d 1162, 1166 (10th Cir. 1995) ("[T]o defeat [defendant's] motion for summary judgment, [plaintiff] must establish with specificity both that her termination violated a constitutional right and that the right violated was clearly established at the time of the violation."); *Rhoades*, 2023 WL 2742239, at *2 ("Here the broad right in question—notice and an opportunity to be heard prior to deprivation of a property right—was clearly established . . . . The more nuanced question is whether it was clearly established that the Oklahoma statute . . . gave Plaintiff a property right[.]").

Here, in late March of 2019, the legislature already had enacted Kan. Stat. Ann. § 74-2113 when Chief of Staff Lawrence allegedly forced plaintiff to resign. And one could argue that the law and its accompanying property right was clearly established once the law went into effect. But the court's qualified immunity analysis usually relies on caselaw. Can a right relying on a state statute only be clearly established once a court has interpreted the statute? The answer, of course, is that it depends. Judge Posner explained why in a Seventh Circuit case:

> The fact that a statute has not been construed does not mean that there is no law, that anything goes. There is always the statute itself, and if its meaning

37

is clear without benefit of judicial interpretation the officials enforcing it cannot reasonably go against it.

. . . .

[W]hen a proposed statutory interpretation is arguable, the plaintiff cannot rebut the defense of immunity without showing that the argument has been authoritatively resolved, but when the proposed interpretation is cockeyed, no such showing is required.

*Northen v. City of Chi.*, 126 F.3d 1024, 1028 (7th Cir. 1997) (Posner, C. J.) (internal citations omitted).  Similarly, our Circuit has held that, when it's "unclear" whether a state statute confers a property right, the property right isn't clearly established.  *Derda*, 53 F.3d at 1166 (reversing summary judgment denying qualified immunity because plaintiff had failed to meet clearly established prong where state courts had interpreted statute differently, so it was "at least unclear whether [the statute was] intended to confer on employees an interest in continued employment").

That's the situation here.  The "proposed statutory interpretation" of Kan. Stat. Ann. § 74-2113 and its accompanying property right was "arguable."  *Northern*, 126 F.3d at 1028. And neither party offered a "cockeyed" interpretation.  *Id.*  Indeed, in its Motion to Dismiss Order, the court concluded that "[e]ach side of the caption present[ed] a compelling argument why the plain language of the statute favors the competing constructions that each side proposes."  Doc. 22 at 34.  This lack of clarity whether Kan. Stat. Ann. § 74-2113 created a property right means plaintiff "has failed to demonstrate that any right violated was clearly established at the time [he] was terminated."  *Derda*, 53 F.3d at 1166.  Putting it differently, if the court couldn't tell whether the statute entitled plaintiff to return to his Major position and needed to ask the Kansas Supreme Court for guidance on this issue in Kansas law, Chief of Staff Lawrence couldn't tell, either.  So, plaintiff's right to return to his Major position wasn't "sufficiently clear that every reasonable official would have understood that what he is doing

violates that right." *Mullenix*, 577 U.S. at 11 (citation and internal quotation marks omitted). The court thus concludes that Chief of Staff Lawrence is entitled to qualified immunity against plaintiff's Count II. The court thus grants summary judgment against Count II's claim against Chief of Staff Lawrence.

### D.     Tortious Interference (Count III)

Count III of the Complaint asserts a claim for tortious interference with prospective business relationship, "TIPBR" for short. *See* Doc. 37 at 9 (Pretrial Order ¶ 4.a.iii.). The parties agree that Kansas law governs this claim. *Id.* at 2 (Pretrial Order ¶ 1.d.). A TIPBR claim governed by Kansas law has five distinct elements. *Jackson v. Kan. Cnty. Ass'n Multiline Pool*, No. 03-4181-JAR, 2006 WL 963838 at *18 (D. Kan. Apr. 10, 2006) (citation and internal quotation marks omitted).[8] But here, one additional requirement effectively disposes of plaintiff's claim. Specifically, a claim for TIPBR "requires some type of communication between the defendant and [a] third party in which the defendant induces the third party not to engage in a prospective contract or business relation with the plaintiff." *Id.* (citation and internal quotation marks omitted).

Here, "the defendant" on the TIPBR claim is Chief of Staff Lawrence, sued in his individual capacity. And according to the Pretrial Order and plaintiff's response to the summary judgment motion, the prospective business relationship that Chief of Staff Lawrence purportedly

---

[8]     The elements are: "(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of that relationship or expectancy by the defendant; (3) a reasonable certainty that plaintiff would have continued the relationship or realized the expectancy but for the conduct of the defendant; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct." *Stead v. Unified Sch. Dist. No. 259, Sedgwick Cnty., Kan.*, 92 F. Supp. 3d 1088, 1111 (D. Kan. 2015) (citing *Ayres v. AG Processing, Inc.*, 345 F. Supp. 2d 1200, 1210 (D. Kan. 2004) (applying Kansas law)).

interfered with is plaintiff's "business relation with the KHP[.]"  Doc. 37 at 5 (Pretrial Order ¶ 3.a.).  *See also* Doc. 39 at 16.

Below, the court analyzes whether plaintiff had adduced evidence warranting a trial on the TIPBR claim.  This analysis begins with an overview of the third party requirement, as applied by Kansas law to TIPBR claims.  *First*, the court explains the requirement generally, demonstrating its application to corporations and governmental organizations alike.  *Second*, the court explains how individual capacity claims can survive the third party requirement.  *Third*, the court applies this exception to this case's summary judgment facts.

### 1.    Third Party Requirement

The Kansas Court of Appeals has explained the essence of the third party requirement in this fashion:

> [A]n official of a corporation, acting for the corporation, and within the scope of his or her representation of the corporation, cannot be liable for tortious interference with a contract the corporation could legally act on.  In *Clevenger*, [the Court of Appeals] determined that corporate directors could not be held liable for inducing the corporation to terminate employment that the corporation could legally terminate.  This is reasonable.  When conducting business on behalf of a corporation, the corporate officers and directors are acting on the corporation's behalf, and one cannot tortiously interfere with a contract unless he or she is a third party unrelated to the contract.

*Diederich v. Yarnevich*, 196 P.3d 411, 418 (Kan. Ct. App. 2008) (citing *Clevenger v. Cath. Soc. Serv. Of Archdiocese of Kan. City in Kan., Inc.*, 901 P.2d 529, 532–33 (Kan. Ct. App. 1995).[9]

*See also Stanfield v. Osborne Indus., Inc.*, 643 P.2d 1115, 1124–25 (Kan. Ct. App. 1982) (concluding that officers and agents of a corporation, acting within their corporate capacities were not liable for inducing corporation's action which it could lawfully undertake under a

---

[9]    The court recognizes that *Diederich* deals with a claim of tortious interference with contract, instead of tortious interference with business relations.  This distinction doesn't affect the court's analysis because both claims for relief require a third party.

contract), *overruled on other grounds by* 654 P.2d 917 (Kan. 1982).  This third party requirement applies to governmental entities and agencies as well.

Our court applied the third party requirement to governmental organizations in *Stead*.  92 F. Supp. 3d 1088 (D. Kan. 2015).  In that case, plaintiff, an elementary school principal, had resigned her employment after a testing controversy emerged.  *Id.* at 1095.  She later sued the school district and its Superintendent, asserting claims against the Superintendent in both his official capacity and individual capacity.  *Id.* at 1094.  Plaintiff asserted a tortious interference claim against the Superintendent alleging interference with prospective business relationship (or advantage).  Plaintiff theorized that the school district's Superintendent had interfered with a prospective business relationship between plaintiff and the school district who employed her before resigning.  *Id.* at 1111.

The Superintendent moved for summary judgment against the TIPBR claim.  He advanced two distinct and independent arguments.  The first, relevant here, asserted that the third party rule precluded plaintiff's official capacity claim against him.  This court agreed, explaining that when "Superintendent Allison acted in his official capacity, it was the [School] District, not Superintendent Allision, who acted."  *Id.* at 1111–12.  But plaintiff also had asserted the TIPBR claim against the Superintendent in his individual capacity.  The court recognized that the individual capacity claim was legally viable because, when sued in "his non-official capacity, Superintendent Allison qualifies as a third party to plaintiff's business expectancy with the [School] District."  *Id.* at 1112 (citing *Diederich*, 196 P.3d at 419).

But *Stead* also recognized that a viable individual capacity claim requires more than careful wording.  Instead, a TIPBR plaintiff making such a claim must adduce "facts showing that [the official sued] acted 'outside the scope of [his] employment' or 'for [his] own individual

advantage' when he investigated plaintiff and solicited her resignation." *Id.* at 1112–13 (citing *Diederich*, 196 P.3d at 418).

### 2.    Third Party Requirement Exception

As *Diederich* and *Stead* recognize, individual capacity claims for tortious interference can qualify for a narrow exception to the third party rule.  Highly summarized, a TIPBR plaintiff may assert a *legally* viable tortious interference claim by alleging that the corporate agent:  (a) acted "outside the scope of his employment;" or (b) "for his own individual advantage[.]" *Id.* at 1113 (brackets omitted) (citing *Diederich*, 196 P.3d at 418).

Plaintiff here seizes the first of these two options—the "outside the scope" exception. Specifically, he asserts that Chief of Staff Lawrence "acted outside the scope of his authority in obtaining [plaintiff]'s resignation from the KHP" in their March 2019 meeting.  Doc. 39 at 15. More specifically, plaintiff contends there is "a disputed factual issue" whether Chief of Staff Lawrence "acted outside the scope of his authority in obtaining [plaintiff]'s resignation." *Id.*  So, plaintiff concludes a jury must decide this individual capacity claim.

Part 3, following, considers the material that—according to plaintiff—establishes this dispute of fact.  His argument has two parts.  The court explains why neither argument establishes a triable issue.

### 3.    Plaintiff's Scope of Authority Argument

Plaintiff's first argument contends that the Pretrial Order establishes a dispute of material fact whether defendant Lawrence "act[ed] outside the scope of his authority."  Doc. 39 at 16 (citing Doc. 37 at 5 (Pretrial Order ¶ 3.a.)).  There is nothing inherently improper about a non-movant using material from the Pretrial Order to meet his summary judgment burden.  *See* Fed. R. Civ. P. 56(c) (explaining party asserting that "a fact" is "genuinely disputed" must support the assertion by:  "citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, or affidavits, declarations, stipulations . . . , admissions, interrogatory answers, or other materials"). More narrowly, though, it depends on which part of the Pretrial Order is invoked. For example, it's easy to imagine that a party properly could use a stipulation memorialized in the Pretrial Order to demonstrate a material dispute of fact. But that's not the play that plaintiff makes here. Instead, this plaintiff relies on the portion of the Pretrial Order setting out "Plaintiff's Factual Contentions." *See* Doc. 39 at 16 (quoting Doc. 37 at 5 (Pretrial Order ¶ 3.a.)). And that's a problem because the Supreme Court and our Circuit have held, time and again, that a party's allegations can't stave off summary judgment.

For instance, in two decisions issued the same day in 1986, the Supreme Court explicitly rejected the approach that plaintiff invokes here. As one of them explained, Rule 56 was amended "to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made [summary judgment] motion by reference only to its pleadings." *Celotex*, 477 U.S. at 325.[10] This approach, the Court explained, comports with "[o]ne of the principal purposes of the summary judgment rule," which "is to isolate and dispose of factually unsupported claims or defenses[.]" *Id.* at 323–24. A second case decided the same day as *Celotex Corp.* made the same point. It explained that "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477

---

[10] When the Court decided *Celotex Corp.*, the last two sentences of Rule 56(e) provided: "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate shall be entered against him." Fed. R. Civ. P. 56(e) (1986 version). Several restylings and amendments of this rule have followed since 1986. But as a leading commentator has explained, none of these revisions displace the principle recognized in *Celotex Corp. See* 10B Charles Alan Wright, et al., *Federal Practice and Procedure*, § 2739 (4th ed. 2023).

U.S. at 248 (quotation cleaned up) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).  *See also* 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2712 (4th ed. 2023) ("On the other hand, the apparent existence of a factual dispute based on a denial in the answer or an allegation in the complaint does not automatically defeat a Rule 56 motion.  If it did, the rule could be rendered nugatory by clever pleading.")

Tenth Circuit law follows form.  In *Kannady*, the Circuit explained that when a summary judgment movant carries its initial burden—as defendants do here—"'the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'"  590 F.3d at 1161 (quoting *Jenkins*, 81 F.3d at 990).  Here, plaintiff, the party asserting the TIPBR claim, bears the burden of proof to go forward on that claim at trial, and inherits that same burden at summary judgment. *See* Fed. R. Civ. P. 56(c)(1) (explaining party asserting that a fact is "genuinely disputed must support that assertion" by "citing to particular parts of materials in the record").

In sum, a cardinal rule of contemporary summary judgment practice rejects plaintiff's resort to his allegations.  Plaintiff's first argument doesn't sustain his summary judgment burden.

Plaintiff's second argument is different.  It follows controlling summary judgment procedure.  He, as the "party asserting that a fact . . . is genuinely disputed" attempts to support his assertion by "citing to particular parts of material in the record[.]"  Fed. R. Civ. P. 56(c)(1)(A).  But in the end, plaintiff's second argument fares no better than his first one.

Start with the factual backdrop for plaintiff's effort to demonstrate a dispute of material fact.  Defendants' summary judgment motion identified two pertinent statements of fact as undisputed.  The first of them reads as follows:

> 21.     Seven to ten days prior to March 28, 2019, Governor Kelly concluded her administration needed to make a change in the leadership at KHP.

Doc. 38 at 4 (Defs.' Statement of Facts ¶ 21).  Plaintiff's response agrees, the fact in ¶ 21 is undisputed for purposes of summary judgment.  Doc. 39 at 2.  The second pertinent fact comes from the next paragraph.

> 22.     Governor Kelly tasked Chief of Staff Lawrence to effect the change in the administration of the KHP and gave him latitude to carry it out.

Plaintiff responded to ¶ 22's factual proposition with this:

> 22.     Controverted in part.  Mr. Lawrence testified in his declaration as follows:

> During our meeting [on March 28, 2019], I informed [plaintiff] that he had the option of (a) resigning and returning from his position as Superintendent, or the option of (b) being terminated from the position of Superintendent and return to the rank of Major in a temporary, unclassified position from which he would be dismissed while in a probationary status at that rank.

Doc. 39 at 2 (responding to Defs.' Statement of Facts ¶ 22).

Now, turn to the argument plaintiff makes based on these parts of the summary judgment record.  He argues that "Governor Kelly alone had the authority to exercise her judgment and discretion in regard to [plaintiff's] continuing employment with the KHP."  *Id.* at 16.  And, plaintiff contends, the Governor "could only delegate to [Chief of Staff Lawrence] the ministerial duty to carry out her decision regarding [plaintiff's] employment with the KHP."  *Id.* at 16–17.  Plaintiff then argues that a reasonable jury could infer from Chief of Staff Lawrence's testimony that "Governor Kelly had only authorized" Chief of Staff Lawrence "to offer [plaintiff] a *choice* between (a) resigning and returning from his position as Superintendent, or (b) being returned to the rank of Major in a temporary, unclassified position."  *Id.* at 17 (emphasis in original).  And in

their March 2019 meeting, plaintiff argues that Chief of Staff Lawrence "only told him that 'we need you to resign'" but Chief of Staff Lawrence "never discussed the option of returning to his former rank of Major." *Id.* All this adds up, plaintiff contends, to the possibility that a reasonable jury could find that Chief of Staff Lawrence "acted outside the scope of his authority by failing to discuss with [plaintiff] the option of returning to his former rank of Major." *Id.*

The court is wholly unpersuaded by plaintiff's lack of authority argument. No reasonable jury could find or infer that any of the statements in Chief of Staff Lawrence's Declaration contradict the pertinent statements of material facts on the authority issue, *i.e.*, that Governor Kelly "concluded her administration needed to make a change" in KHP's leadership, (Defs.' Statement of Facts ¶ 21), and that the Governor "gave [Chief of Staff Lawrence] latitude to carry it out[.]" *Id.* (Defs.' Statement of Facts ¶ 22). The testimony plaintiff cites trying to counter these two facts doesn't suggest that Chief of Staff Lawrence exceeded the latitude the Governor, the elected leader of Kansas's executive branch, had conferred on her Chief of Staff. And, the court concludes, no reasonable jury could read those statements to do so. The court's conclusion is particularly certain because it's undisputed that plaintiff already "knew" the things that Chief of Staff Lawrence purportedly omitted from telling him during their March 28, 2019 meeting. It's undisputed that plaintiff knew that: (1) a Kansas statute entitled him, at the end of his term as Superintendent, to "return to the rank he held at the time of his appointment;" and (2) plaintiff undeniably "knew" that he, if fired as Superintendent, "had the right to go back to his previous rank (major)." *Compare* Doc. 38 at 6 (Defs.' Statement of Facts ¶¶ 37 and 38), *with* Doc. 39 at 4 (plaintiff's response, agreeing that these facts aren't controverted).

In sum, neither of plaintiff's two arguments identifies a dispute of material fact.

### 4.      Tortious Interference Conclusion

Chief of Staff Will Lawrence has established that he is entitled to summary judgment against Count III's claim for tortious interference with prospective business relationship.  The Kansas third party rule requires plaintiff to show that Chief of Staff Lawrence interfered with a prospective relationship between plaintiff and a third party.  Here, plaintiff's claim asserts that the third party is the Kansas Highway Patrol, an agency of the State of Kansas.  Chief of Staff Lawrence, when acting in his official capacity as Chief of Staff to Kansas's Governor, was an agent of the same governmental entity.  So, there's no third party.  Nor is there a third party to the version of this claim where plaintiff sues Chief of Staff Lawrence in his individual capacity, either.  This legal theory might prove viable if plaintiff had adduced evidence that Chief of Staff Lawrence exceeded the scope of his authority.  He hasn't.

The court grants summary judgment against Count III.

## V.      Conclusion

For the reasons explained above, the court grants defendants' Motion for Summary Judgment (Doc. 38) in part and denies it in part.  The undisputed summary judgment facts, viewed in plaintiff's favor, present a triable issue whether Governor Kelly coerced plaintiff to resign without providing him notice and an opportunity to be heard.  The court thus denies summary judgment against plaintiff's claim that Governor Kelly and Superintendent Jones violated his due process rights.  But the court concludes that plaintiff's property interest wasn't clearly established when Chief of Staff Lawrence asked plaintiff to resign.  The court thus grants Chief of Staff Lawrence qualified immunity against plaintiff's due process violation claim, and thus grants summary judgment against Count II on that basis.  And, the undisputed summary judgment facts, viewed in plaintiff's favor, present no triable issue whether Chief of Staff Lawrence tortiously interfered with plaintiff's business relationship with the State.  The court

thus grants defendants' motion for summary judgment against plaintiff's tortious interference claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 38) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion for Leave to File Surreply Brief (Doc. 41) is granted.

**IT IS FURTHER ORDERED THAT** plaintiff and defendants have 14 days from the date this Order is filed to file a brief not to exceed 10 pages explaining whether they'd like to keep the case set for a jury trial when Count I seeks just injunctive relief.  Plaintiff and defendants have seven days to file reply briefs, not to exceed five pages.

**IT IS FURTHER ORDERED THAT** defendant Will Lawrence is terminated as a party.

**IT IS SO ORDERED.**

**Dated this 15th day of December, 2023, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**