## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**MARK A. BRUCE**,

                              **Plaintiff**,                    **Case No. 20-4077-DDC**

**v.**

**LAURA KELLY, et al.**,

                              **Defendants**.

<u>**MEMORANDUM OF DECISION UNDER RULE 52(a)**</u>

Plaintiff Mark A. Bruce previously served as Superintendent of the Kansas Highway Patrol.  In March 2019, defendant Governor Laura Kelly decided to make a change in KHP leadership, and she deputized her Chief of Staff, William Lawrence, to effectuate that change. Mr. Lawrence met with plaintiff and plaintiff resigned.  Plaintiff then filed this lawsuit, alleging he had resigned involuntarily.  After the dispositive motions in the case, one claim remained for trial:  plaintiff's procedural due process claim asserted against defendants Governor Kelly and current KHP Superintendent Erik Smith.  Plaintiff alleges that defendant Governor Kelly violated his procedural due process rights when, through Mr. Lawrence, she coerced him to resign and failed to return him to his former rank of Major, as Kansas law required.  So, the case boils down to this question:  Did plaintiff resign voluntarily?

The test used to determine whether plaintiff resigned voluntarily asks whether a reasonable person—considering the totality of the circumstances—would feel forced to resign. To answer this objective question, the court empaneled an advisory jury.  It asked the advisory jury this question:  "Do you find plaintiff Mark A. Bruce has proven by a preponderance of the

evidence that the resignation from his employment with the Kansas Highway Patrol was involuntary and coerced by the defendant, Governor Laura Kelly, acting through her Chief of Staff, William Lawrence?"  Six of seven jurors answered "Yes."

Defendants ask the court to set the advisory jury verdict aside and conclude that plaintiff voluntarily resigned, waiving his procedural due process rights.  The court declines.  The court heard the same evidence the jury did.  Each side of the caption presented evidence supporting its version of events.  And the advisory jury credited plaintiff's version, concluding a reasonable person in plaintiff's position would have felt forced to resign.  The court adopts this verdict.  Indeed, the court can think of no better barometer for the dispositive, reasonable person measurement than a jury.  It thus concludes that plaintiff prevails on his § 1983 procedural due process claim.  As a result, the court denies defendants' oral Rule 52 motion.[1]

The court, consistent with Fed. R. Civ. P. 52(a), states its specific findings of fact and conclusions of law, below.

## I.      Findings of Fact

### *The Kansas Highway Patrol*

The court begins with a brief primer on the KHP.  The KHP is a state agency with a hierarchal structure.  The Kansas Civil Service Act governs the KHP, and it designates two classes of employees:  classified and unclassified.  Kan. Stat. Ann. § 75-2935.  Classified employees are the default.  After a probationary period—during which the employer may terminate the classified employee at will—the classified employee achieves permanent status.  And permanent, classified employees enjoy employment protections.  The employer only may dismiss, demote, or suspend a classified employee for valid cause after following various

---

[1]      The court, in its discretion, took this motion under advisement under Fed. R. Civ. P. 52(c).

procedural and substantive safeguards, *i.e.*, prior notice and the right to appeal to the Civil

Service Board.  Kan. Stat. Ann. § 75-2949d.  In contrast, an employee qualifies as unclassified if

a statute designates that employee as unclassified.  Unclassified employees serve at the pleasure

of their appointing authority, who may terminate them at will.

### *Plaintiff's Path to Superintendent*

Plaintiff began working for the KHP in 1989.  During his 30 year KHP career, plaintiff

earned a master's degree in criminal justice.  And over the course of his career, plaintiff moved

up the KHP's ladder of classified positions:  Trooper, Trooper II, Sergeant, Second Lieutenant,

Lieutenant, Captain, and Major.  Plaintiff became a Major in 2008, served his probationary

period, and then achieved permanent status in the classified service.  So, he enjoyed the

employment protections of classified employees, outlined above.  Plaintiff's performance

evaluations as a Major all rated plaintiff's performance as satisfactory or higher.

In 2015, then-Governor Sam Brownback appointed plaintiff as KHP Superintendent.  The

Superintendent position is unclassified.  That classification means the KHP Superintendent

serves at the pleasure of the Governor, in an at-will position.  Plaintiff understood that he would

remain employed as Superintendent for as long as the Governor wanted him to serve as

Superintendent.  In contrast, Major—the position plaintiff held before he became

Superintendent—is a classified position.  Procedural due process protections apply to KHP

Majors.  If the Governor decided not to retain him as Superintendent, plaintiff understood he

would return to the position of Major within the classified service.

Governor Kelly won the 2018 gubernatorial election.  Plaintiff met with Governor Kelly

and her Chief of Staff, Will Lawrence, near the end of 2018.  After the meeting, Governor Kelly

asked plaintiff to remain Superintendent for four more years.

*Plaintiff's Experience with Employment Decisions at KHP*

During his time as a Major, plaintiff decided to terminate employees under his supervision six to twelve times.  Plaintiff also had employees resign from employment.  Plaintiff testified that a resignation is a voluntary, friendly process, with a prearranged time for resigning employees to turn in their equipment.  In contrast, when KHP terminates an employee's employment, the KHP immediately collects the terminated employee's patrol equipment and shuts off the employee's access to facilities and computers.  In plaintiff's experience, the KHP sometimes would give the employee an option between termination and resignation.  The employee's choice between the two would determine the language in the letter given to the employee—*i.e.*, a resignation reflects a friendly agreement between KHP and the employee to part ways.

For example, plaintiff supervised Herman Jones.  When Mr. Jones resigned, he gave KHP advance notice.  Mr. Jones was allowed to choose the date of his resignation.  And, until the effective date of his resignation, Mr. Jones continued reporting to the KHP headquarters, working in his office, and accessing its computer system.  Mr. Jones also received a ceremony following his resignation.  As another example, a previous Superintendent, Mr. Maple, retired from the KHP.  After Mr. Maple retired, he still came to his office and drove his KHP vehicle.  The KHP held a retirement reception for Mr. Maple.

When plaintiff first became Superintendent in 2015, he worked with the legislature to adopt the Career Progression Plan—a salary model designed to help KHP recruit employees.  Some Majors had entered the unclassified service voluntarily to receive extra pay.  Plaintiff sought to provide those Majors with the same benefits he enjoyed as Superintendent:  the opportunity to return to the last position they held as a classified employee.  Plaintiff testified in favor of this legislation, which the legislature eventually enacted as a Kansas law.

4

### *Trouble at KHP*

In late 2018, plaintiff's Assistant Superintendent, Randy Moon, was involved in a domestic violence incident in Missouri.  When plaintiff became aware of this incident, he contacted both Governor Brownback's Chief of Staff and Governor-elect Kelly's Chief of Staff, Mr. Lawrence.  Plaintiff then initiated an investigation with KHP's internal affairs.  Ultimately, Missouri authorities didn't find anything to substantiate a criminal violation and the internal investigation found no violations of KHP policy or criminal law.  Plaintiff provided Mr. Lawrence with a copy of the internal investigation.  A third entity, the Kansas Commission on Peace Officers' Standard and Training (CPOST), investigated and found no substantiated wrongdoing.  Plaintiff never had the opportunity to share results of the CPOST investigation with Governor Kelly's staff.

Plaintiff also handled another incident while serving as Superintendent.  The ex-husband of the KHP's general counsel, Tammie Lord, accused Ms. Lord of having an affair with another KHP employee.  Plaintiff directed the Department of Administration to investigate.  Plaintiff chose this agency for the investigation so that KHP wouldn't control the investigation's course.  Eventually, Ms. Lord's ex-husband withdrew his complaint.  At that point, plaintiff considered the investigation complete.

Though these two incidents ended without any findings of wrongdoing, in the early months of 2019, anonymous emails went out to all state legislators, several law enforcement agencies, and the media.  These emails provided details about the Randy Moon and the Tammie Lord incidents.  Plaintiff discussed these anonymous letters with Mr. Lawrence, and Mr. Lawrence commended plaintiff on the transparency of the Randy Moon investigation.

In March 2019, the Governor decided to change the KHP's leadership.  Governor Kelly tasked Mr. Lawrence with effectuating this change.  She gave Mr. Lawrence a great deal of

latitude in executing her decision.  Mr. Lawrence contacted Kraig Knowlton, Director of

Personnel Services for the State of Kansas, for help.  Mr. Knowlton sent Mr. Lawrence form

letters to use in Mr. Lawrence's meeting with plaintiff.  Mr. Lawrence revised those letters.

### *The March 28, 2019, Meeting*

On March 28, 2019, plaintiff went to Mr. Lawrence's office for a meeting.  Once plaintiff

sat down, Mr. Lawrence said, "We need you to resign.  We can't get past this Randy Moon

thing."  Plaintiff was shocked.  Plaintiff believed he had dealt with the issues appropriately and

to the satisfaction of the governor's office, and no one had told him differently.  Plaintiff and Mr.

Lawrence discussed the Randy Moon incident, and Mr. Lawrence also brought up the Tammie

Lord incident.  And Mr. Lawrence mentioned other management issues.  When plaintiff asked

about those other management issues, Mr. Lawrence mentioned an issue with the KHP budget

for additional aircraft.  Governor Kelly had asked agencies to stick to the amounts set in

Governor Brownback's budget, but when plaintiff presented to budget committees in the

legislature, he mentioned the KHP aircraft operations.  Plaintiff didn't ask for any money, but

one of the representatives introduced legislation that added aircraft funding to the KHP budget.

Plaintiff explained to Mr. Lawrence that he didn't ask the legislature for any additional funding.

After talking about these issues, Mr. Lawrence presented plaintiff with a letter of

resignation.  Here's how the unsigned resignation letter looked:

March 28, 2019

Will Lawrence
Chief of Staff                                             HAND DELIVERED
Governor Laura Kelly

Dear Will:

This letter is to advise you that I hereby resign my position as Superintendent of the Kansas
Highway Patrol, effective April 6, 2019.

                                                        Sincerely,


                                                        Mark A. Bruce

cc:     Employee Personnel File

Pl. Ex. 4.

Though Mr. Lawrence presented plaintiff with a letter of resignation, Mr. Lawrence also

had another letter prepared to give plaintiff.  That letter, also dated March 28, referred to

plaintiff's *termination* from employment:



Def. Ex. 412.  Note that the termination letter—the second one—returned plaintiff to the rank of Major.  But plaintiff never saw this letter.

Though plaintiff never saw the termination letter, plaintiff suspected—based on his experience in similar situations—that Mr. Lawrence had termination documents with him.  Yet the topic of plaintiff returning to Major never came up during the meeting.  During their discussion, plaintiff and Mr. Lawrence never discussed the benefits of retirement versus demotion, nor any of the nuts and bolts of plaintiff's payout—*i.e.*, sick leave payout, vacation.  Plaintiff and Mr. Lawrence only discussed the need for plaintiff to resign.[2]  When asked whether he knew, going into the meeting, that he could insist that the Governor fire him as Superintendent—thus allowing him to return to the classified role of Major and continuing working for the KHP—plaintiff testified, "That was the furthest thing from my mind."

Ultimately, plaintiff signed the resignation letter because he didn't feel like he had any choice.  He didn't think he had the option to take time to think about his decision, nor did Mr. Lawrence offer plaintiff any time to think about it.  Here's how the resignation letter plaintiff signed looked:

---

[2]    Mr. Lawrence's testimony contradicted this proposition.  Mr. Lawrence denied telling plaintiff, "We need you to resign."  Mr. Lawrence testified he never asked plaintiff to resign, and he wanted to give plaintiff a choice.  Mr. Lawrence also testified that he gave plaintiff the option to return to his former rank of Major.  But the vast majority of the advisory jury didn't buy it.  The advisory jury concluded that Governor Kelly, through Mr. Lawrence, had coerced plaintiff into resigning and that plaintiff resigned involuntarily.  To reach this advisory verdict—a verdict the court accepts in this Order—the jury necessarily accredited plaintiff's testimony about the meeting over Mr. Lawrence's.  On this particular question, the court credits plaintiff's version of events.  The court thus bases its findings of facts about the meeting on plaintiff's testimony, not Mr. Lawrence's.



March 28, 2019

Will Lawrence
Chief of Staff                                    HAND DELIVERED
Governor Laura Kelly

Dear Will:

This letter is to advise you that I hereby resign my position as Superintendent of the Kansas Highway Patrol, effective April 8, 2019.

Sincerely,

Mark A. Bruce
Mark A. Bruce

Pl. Ex. 5.  After plaintiff had signed the resignation letter, Mr. Lawrence gave plaintiff a letter confirming receipt and acceptance of plaintiff's resignation.  Pl. Ex. 7.  That acceptance letter ordered plaintiff to surrender his weapons, return any state property, and notified plaintiff that the state would inactivate his computer access and security badge.  When plaintiff read the letter from Mr. Lawrence, plaintiff understood that the Governor had dismissed him completely from employment with KHP.

After the meeting, Mr. Lawrence had prearranged transportation for plaintiff because he'd driven his patrol vehicle to the Capitol.  Mr. Lawrence had arranged for a KHP Major to drive plaintiff home and the Major took plaintiff's firearm.  This surprised plaintiff.  When the Major took plaintiff's firearm, plaintiff came to the conclusion that his KHP employment had ended.

Once plaintiff returned home, he realized that the acceptance letter from Mr. Lawrence said, "Please make arrangement with KHP staff to return all other State of Kansas devices, equipment, or property prior to the effective date of your *dismissal*."  Pl. Ex. 7 (emphasis added).

9

Plaintiff, concerned about his future employment prospects, didn't want "dismissal" associated with his employment. So, he asked Mr. Lawrence to change the language on the resignation acceptance letter to resignation. Mr. Lawrence agreed, and did so. Plaintiff also consulted with others about his retirement benefits. Plaintiff learned that April 8 was a better date than April 6, so he asked Mr. Lawrence to change the effective date of his resignation, and Mr. Lawrence agreed. Above, in plaintiff's Exhibit 5, one can see that Mr. Lawrence crossed out 6 and wrote 8 on plaintiff's signed resignation letter. And, after considering his retirement benefits, on April 2, plaintiff sent a letter to the Governor, informing her that April 8, 2019, would function as his final day on the payroll and he would retire from the KHP, effective May 1, 2019. Pl. Ex. 8. Plaintiff never received a retirement ceremony. Plaintiff did receive, however, a retirement certificate. Usually, the KHP Superintendent and the Governor sign a retirement certificate. But, according to Mr. Lawrence, the Governor refused to sign plaintiff's retirement certificate.

## II.        Conclusions of Law

Plaintiff brings a § 1983 claim against defendants Governor Kelly and Erik Smith, in their official capacities, claiming that they violated plaintiff's due process rights. Our Circuit has explained that "'[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the . . . Fourteenth Amendment.'" *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). "Whether the right to due process was violated is a mixed question of law and fact." *Manlove v. Tansy*, 981 F.2d 473, 476 (10th Cir. 1992). A procedural due process claim requires a two-step inquiry: (1) "whether the plaintiff had a constitutionally protected interest[,]" and (2) "whether the process afforded was adequate

to protect that interest." *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 748 (10th Cir. 2013) (citation omitted).  Only the first step is at issue here.[3]

The first requirement—existence of a constitutionally protected property interest—"does not arise from the Due Process Clause itself[.]"  *Martin Marietta Materials, Inc. v. Kan. Dep't of Transp.*, 810 F.3d 1161, 1172–73 (10th Cir. 2016) (citation omitted).  Instead, protected property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *see also Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996) ("The question whether a plaintiff had a protected property interest is determined by state law." (citing *Casias v. City of Raton*, 738 F.2d 392, 394 (10th Cir. 1984))).  Thus, for "purposes of the Fourteenth Amendment's Due Process Clause, property interests must derive from some independent source, such as state law, contract, or other understandings that give rise to a claim of entitlement."  *Eisenhour v. Weber Cnty.*, 744 F.3d 1220, 1232 (10th Cir. 2014) (citing *Roth*, 408 U.S. at 577).

"When a plaintiff claims a property interest in [his] job," the court must determine whether plaintiff "had 'a legitimate expectation of continued employment,' as defined by some independent source such as a contract for a fixed term or state law."  *Id.* (quoting *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998)); *see also McDonald v. Wise*, 769 F.3d 1202, 1210 (10th Cir. 2014) ("A public employee has a property interest in his continued employment where 'state or local law creates a sufficient expectancy of continued employment.'" (quoting

---

[3]     In its Memorandum and Order on defendants' Motion for Summary Judgment, the court ruled that defendants had failed to adduce evidence that they provided plaintiff with the process due—an impartial tribunal, notice, and a sufficient pretermination hearing. Doc. 43 at 28–34.

*Driggins v. City of Okla. City, Okla.*, 954 F.2d 1511, 1513 (10th Cir. 1992))).  Thus, "[s]tate law determines whether a claim of entitlement to employment is sufficient."  *McDonald*, 769 F.3d at 1210 (citing *Driggins*, 954 F.2d at 1513).

Here, plaintiff served as KHP Superintendent, and Kan. Stat. Ann. § 74-2113(a) provides that "[t]he [KHP] superintendent . . . shall be within the unclassified service under the Kansas civil service act" and unclassified employees lack a property interest in their at-will positions. *Stoldt v. City of Toronto*, 678 P.2d 153, 160 (Kan. 1984) (explaining that when public employment is at will, the employee lacks a constitutionally protected property interest).  But, Kansas law also provides that when a Governor terminates a KHP Superintendent, the Superintendent "shall be returned to a rank not lower than the rank the person held when appointed as superintendent[.]"  Kan. Stat. Ann. § 74-2113(a).  The Kansas Supreme Court has interpreted Kan. Stat. Ann. § 74-2113 to define the rank of KHP Major as a classified position. Doc. 27-1 at 4; *Bruce v. Kelly*, 514 P.3d 1007, 1010 (Kan. 2022).  The Kansas Supreme Court also held that an employee returning to a previously-held permanent position—*i.e.*, returning to Major from Superintendent—needn't serve an additional six-month, at-will probationary period before enjoying permanent status.  *Bruce*, 514 P.3d at 1029.  Defendants don't dispute this proposition.  Doc. 98 at 14 ("The other option Bruce knew to be available to him was to insist that the governor dismiss him as KHP Superintendent and return to the rank of major in the classified service with permanent status[.]").

The first step of the due process inquiry—plaintiff's property interest in his job—thus turns on whether Governor Kelly terminated plaintiff's employment.  The conflict on this point is straightforward.  Defendants maintain that plaintiff voluntarily resigned from his position as Superintendent.  Defendants emphasize that plaintiff was educated and experienced, so he knew

that he could force Governor Kelly to terminate his employment, thus triggering the laws that allowed him to return to Major.  In contrast, plaintiff maintains that defendants forced him to resign, terminating his employment and entitling him to return to Major.  While there was competing evidence, the advisory jury adopted plaintiff's view.  The court thus adopts and accepts that view, and explains why, below.

"[I]f an employee voluntarily relinquishes a property interest, then no procedural due process violation has occurred."  *Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trs.*, 610 F.3d 558, 564 (10th Cir. 2010) (citations and internal quotation marks omitted).  But when an employee's "resignation was so involuntary it amounted to a constructive discharge, defendants did deprive [him] of [his] property interest without due process."  *Parker v. Bd. of Regents of Tulsa Jr. Coll.*, 981 F.2d 1159, 1162 (10th Cir. 1992) (citing *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988)).  "A resignation will be involuntary and coerced when the totality of the circumstances indicate the employee did not have the opportunity to make a free choice."  *Id.* (citing *Stone*, 855 F.2d at 174).

The Tenth Circuit has adopted four factors that control the decision whether a resignation amounts to an involuntary constructive discharge:  "'(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation.'"  *Id.* (quoting *Stone*, 855 F.2d at 174).  Each factor weighs equally and each one uses an objective standard.  *Yearous v. Niobrara Cnty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997) (citing *Parker*, 981 F.2d at 1162).  Plaintiff faces "a substantial burden" to establish constructive discharge.  *Narotzky*, 610 F.3d at 565.  "'[W]hether a constructive discharge occurred is a question of fact[.]'"  *Id.* (quoting

*Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009)).  The court evaluates each factor in turn, and, ultimately, it finds that Governor Kelly, acting through Mr. Lawrence, constructively discharged plaintiff.

*First*, Governor Kelly, through Mr. Lawrence, never gave plaintiff an alternative to resignation.  Mr. Lawrence told plaintiff that he needed to resign because of management and budget issues, explaining that he couldn't get past the Randy Moon incident.  Plaintiff testified he was "shocked."  Mr. Lawrence presented plaintiff with a resignation letter.  Plaintiff and Mr. Lawrence only discussed resignation.  A reasonable person in plaintiff's shoes would conclude that his employment was ending, and he had no choice but to resign.  This factor thus favors plaintiff.

*Second*, plaintiff didn't understand a choice was available to him.  Indeed, Mr. Lawrence didn't give plaintiff any choice.  He told plaintiff merely, "We need you to resign."  The second factor thus also favors plaintiff.

*Third*, Mr. Lawrence didn't give plaintiff a reasonable amount of time to decide.  The Tenth Circuit considers anywhere from several hours to weeks a reasonable time for an employee to decide whether to resign.  *See Cacy v. City of Chickasha, Okla.*, 124 F.3d 216, 1997 WL 537864, at *3–5 (10th Cir. 1997) (concluding plaintiff voluntarily resigned when defendant gave plaintiff "two full weeks" to resign); *Parker*, 981 F.2d at 1162 (concluding plaintiff voluntarily resigned when defendant gave employee a week to decide); *see also Stone*, 855 F.2d at 177 (concluding plaintiff voluntarily resigned when defendant gave plaintiff "several hours to contact an attorney"); *Rhoades v. Oklahoma ex rel. Stitt*, No. CIV-20-761-R, 2023 WL 2742239, at *5–6 (W.D. Okla. Mar. 30, 2023) (finding plaintiff *didn't* voluntarily resign when, over the span of a telephone conversation, defendant asked plaintiff to resign and plaintiff agreed).  The

meeting between plaintiff and Mr. Lawrence consumed less than an hour, well below the several hours or weeks our Circuit treats as a reasonable amount of time.  And so, this factor favors plaintiff.

*Last*, the final factor asks whether Governor Kelly, acting through Mr. Lawrence, permitted plaintiff to select the effective date of his resignation.  He did.  Plaintiff asked Mr. Lawrence to change the effective date of his resignation from April 6 to April 8.  And Mr. Lawrence readily agreed.  This factor thus favors defendants.

In sum, three of *Parker*'s four factors favor a finding of constructive discharge.  And as the Circuit notes, each factor holds equal weight.  Also, six of seven advisory jurors, after hearing all witness testimony and considering the trial evidence, concluded plaintiff had shouldered his burden to show that Governor Kelly, acting through Mr. Lawrence, constructively discharged plaintiff.[4]  The court, after observing and evaluating the same evidence, agrees with this verdict and adopts it as its own conclusion as well.  Simply put, "the totality of the circumstances indicate the employee did not have the opportunity to make a free choice." *Parker*, 981 F.2d at 1162.

So, Governor Kelly constructively discharged plaintiff from his position as Superintendent.  When the Governor terminates the KHP Superintendent, Kansas law provides that the Superintendent "shall be returned to a rank not lower than the rank the person held when appointed as superintendent[.]"  Kan. Stat. Ann. § 74-2113(a).  This entitled plaintiff to return to Major.  But he never did.  Instead, Governor Kelly terminated plaintiff from all employment with

---

[4]     The advisory jury couldn't reach a unanimous verdict.  When the jury informed the court of its deadlock, the court asked the parties if they wished to agree to accept a non-unanimous verdict.  They did. So, that's why the jury verdict returned as 6-1, favoring plaintiff.

KHP without any due process. And thus, plaintiff prevails on his § 1983 procedural due process claim. The court considers the appropriate remedy for this claim, next.

## III.        Remedy

Plaintiff seeks only equitable relief for his § 1983 procedural due process claim. According to this case's Pretrial Order, for "Count I, plaintiff seeks prospective equitable relief in the form of reinstatement to the KHP at the rank of Major with permanent status. Plaintiff also seek reasonable attorney fees pursuant to 42 U.S.C. § 1983." Doc. 37 at 10 (Pretrial Order ¶ 5). Plaintiff since has updated his first request for reinstatement, asserting that reinstatement includes enhanced retirement benefits. As explained below, plaintiff is entitled to reinstatement at KHP as a Major. But he is not entitled to enhanced retirement benefits. The court begins this analysis with a brief primer on equitable relief in a case like this one.

"In the absence of a waiver, the Eleventh Amendment forbids a suit for damages against a state in federal court." *Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 994 (10th Cir. 1993). "If the Eleventh Amendment applies, it confers total immunity from suit, not merely a defense to liability." *Id.* (citation omitted). So, generally, "the law considers state officials acting in their official capacities to be acting on behalf of the state and immune from unconsented suits under the Eleventh Amendment." *Elephant Butte Irrigation Dist. of N.M. v. Dep't of Interior*, 160 F.3d 602, 607 (10th Cir. 1998). A "suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). States, of course, "are protected by the Eleventh Amendment[.]" *Id.* at 70. So, defendants are entitled to Eleventh Amendment immunity from suits for damages.

There's a narrow exception to this total immunity for state officials, however, created in *Ex parte Young*, 209 U.S. 123 (1908). Under *Ex parte Young*, "a suit challenging the

constitutionality of a state official's action in enforcing state law is not one against the State."

*Green v. Mansour*, 474 U.S. 64, 68 (1985) (citing *Ex parte Young*, 209 U.S. at 159–60). And,

under *Ex parte Young*, "the Eleventh Amendment does not prevent federal courts from granting

prospective injunctive relief to prevent a continuing violation of federal law." *Id.* (citing *Ex*

*parte Young*, 209 U.S. at 155–56). But the Supreme Court has "refused to extend the reasoning

of *Young* . . . to claims for retrospective relief." *Id.*

　　　Applying these principles to this case, the court orders defendants to reinstate plaintiff.

"Reinstatement of employment is a form of prospective equitable relief that is within the doctrine

of *Ex parte Young*." *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232–33 (10th Cir. 2004)

(citations omitted). The court thus orders defendants to reinstate plaintiff to employment with

the KHP at the rank of Major with permanent status in the classified service at the Step he

previously occupied and pay grade 42.[5]

　　　As its final decision in this Order, the court considers plaintiff's request for enhanced

retirement benefits. The court begins with a brief history of this request.

　　　There's no mention of "enhanced retirement benefits" in this case's Pretrial Order. *See*

Doc. 37. For his procedural due process count, the Pretrial Order records plaintiff's request for

"prospective equitable relief in the form of reinstatement to the KHP at the rank of Major with

---

[5]　　　Plaintiff's proposed Findings of Fact allege that plaintiff, before he was appointed Superintendent, occupied Step 14 on the State's classified pay matrix. Doc. 97 at 13. So, plaintiff asks the court to order defendants to reinstate plaintiff to Step 14 on the pay matrix. But the testimony that plaintiff cites isn't clear. The witness couldn't recall exactly whether plaintiff was Step 13 or Step 14 before he was appointed Superintendent. Without specific evidence about the specific Step, the court declines to be, well, specific. The court thus orders plaintiff returned to the Step he occupied before he was appointed Superintendent.

　　　Plaintiff also asks the court to assign him to pay grade 42. *Id.* He asserts that this is the "current job classification for a Major in the KHP" and this "fact is posted on the official website of the Kansas Department of Administration." *Id.* The court takes judicial notice under Fed. R. Evid. 201 of the Kansas Department of Administration's classification document for Highway Patrol Troopers, available at https://admin.ks.gov/media/cms/Highway_Patrol_Troopers_ce074d30c196d.pdf.

permanent status.  Plaintiff also seeks reasonable attorney fees[.]" *Id.* at 10.  That's it; no mention of enhanced retirement benefits.  "A damages theory omitted from the pretrial order is waived." *Genesis Health Clubs, Inc. v. LED Solar & Light Co.*, 639 F. App'x 550, 557 (10th Cir. 2016); *see also Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[T]heories of damages not included in the pretrial order are waived[.]").

Later, in a pretrial submission, plaintiff mentioned that he plans to seek a "back pay" equitable remedy at trial.  Doc. 50.  According to plaintiff, "reinstatement to the position of Major in the Kansas Highway Patrol[] includes back pay as an integral part of the equitable remedy." *Id.* at 1 (internal quotation marks omitted).  Defendants disagreed, arguing the Eleventh Amendment bars plaintiff from recovering backpay because this is an action against state officials sued in their official capacity.  Doc. 56 at 1–3.  Plaintiff then switched nomenclature, calling his request "front pay."  Doc. 59 at 2.  Plaintiff explained that he "seeks enhanced retirement benefits, to go into effect prospectively, namely, if and when this court orders Mr. Bruce to be reinstated to the classified position of Major in the Kansas Highway Patrol." *Id.* at 2–3 (internal quotation marks and citations omitted).  This dispute lands smack dab in the middle of two Supreme Court cases about the Eleventh Amendment and equitable remedies.  The court outlines these two decisions, below.

Defendants argue this case is like *Edelman v. Jordan*, where plaintiffs sued two state officials for declaratory and injunctive relief, seeking an award of retroactive public benefits that the state had withheld wrongfully.  415 U.S. 651, 653–54 (1974).  The *Edelman* plaintiffs characterized the retroactive public benefits request as "'equitable restitution' instead of damages[.]" *Id.* at 665.  The Court held that, notwithstanding plaintiffs' framing of their relief, the Eleventh Amendment barred payment of such retroactive benefits because "[i]t require[d]

payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation[.]" *Id.* at 668. Also, the Court found the "retroactive award of monetary relief as a form of 'equitable restitution,' . . . is in practical effect indistinguishable in many aspects from an award of damages against the State." *Id.* The award, "to a virtual certainty," would've "be[en] paid from state funds, and not from the pockets of the individual state officials who were the defendants in the action." *Id.* So, *Edelman* held, "a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief, . . . and may not include a retroactive award which requires the payment of funds from the state treasury[.]" *Id.* at 677 (citations omitted).

In contrast, consider *Milliken v. Bradley*, 433 U.S. 267 (1977) (*Milliken II*)—a school desegregation case. There, the district court had issued an injunction that required the state to pay part of the costs to educate students subjected to unconstitutional school segregation in the past. *Id.* at 288–90. The defendant state officials argued that this injunction offended *Edelman* because, they asserted, it was "indistinguishable from an award of money damages against the state based upon the asserted prior misconduct of state officials." *Id.* at 288–89 (internal quotation marks omitted). The Court disagreed, concluding that the district court's order hadn't violated the Eleventh Amendment. The Court distinguished *Milliken*'s order from *Edelman* this way: "The decree to share the future costs of educational components in this case fits squarely within the prospective-compliance exception reaffirmed by *Edelman*." *Id.* at 289. The challenged decree fell within the confines of *Ex parte Young* because it "require[d] state officials, held responsible for unconstitutional conduct, . . . to eliminate a de jure segregated school system." *Id.*

Plaintiff now adds *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690 (3d Cir. 1996) to the discussion.  In it, the Third Circuit tried to fashion a remedy for age discrimination plaintiffs suing state officials for "front pay."  *Id.* at 698.  Plaintiffs alleged that the state officials administering employment tests owed them front pay because the tests unlawfully barred them from employment and harmed them when they didn't secure jobs with an employer.  *Id.*  The Third Circuit rejected this remedy.  While it acknowledged that a fuzzy line separated retrospective and equitable relief, the Third Circuit distinguished between the two this way:

> [R]elief that essentially serves to compensate a party injured in the past by the action of a state official, even though styled as something else, is barred by the Eleventh Amendment.  On the other hand, relief that serves directly to bring an end to a present, continuing violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.

*Id.* at 697–98 (internal quotation marks and citations omitted).  The Third Circuit held that plaintiffs' front pay remedy was "not intended to halt a present, continuing violation of federal law."  *Id.* at 698.  Instead, the "front pay" would have "provide[d] nothing more than compensatory damages which would have to be paid from the Commonwealth's coffers."  *Id.*

Here, plaintiff testified that he currently receives retirement benefits at 80% of his final average salary—32 years of creditable service multiplied by the 2.5% multiplier.  Now, plaintiff wants his current retirement benefits increased to 90% of his final average salary—an increase based on the four years since defendants unlawfully terminated his employment in 2019.  The court rejects this remedy because the Eleventh Amendment bars it.

Plaintiff has cited no case where a court awarded a remedy like this.  Indeed, the only case plaintiff cites—*Blanciak*—rejected a "front pay" remedy.  77 F.3d at 698.  To be sure, defendants would pay this increase in the future, so one logically could term this as a "prospective" remedy.  But it has nothing to do with prospective *compliance*, as *Milliken II*

20

contemplated.  433 U.S. at 289.  And the remedy is "in practical effect indistinguishable in many aspects from an award of damages against the State."  *Edelman*, 415 U.S. at 668.  Plaintiff seeks compensation for the *past* four years.  So, this remedy is best characterized as one seeking money damages from defendants for unlawfully terminating plaintiff's employment.  The Eleventh Amendment bars such a remedy, so the court declines to award it.

**IV.       Conclusion**

Plaintiff prevails on his procedural due process claim against defendants Governor Kelly and Superintendent Smith.  As a result, he's entitled to reinstatement in the KHP as a Major.  But he is not entitled to recover enhanced retirement benefits.

**IT IS THEREFORE ORDERED THAT** the court finds in favor of plaintiff and against defendants Governor Laura Kelly and defendant Superintendent Erik Smith.  The court directs the Clerk of the Court to enter judgment in plaintiff's favor on plaintiff's Count I.

**IT IS FURTHER ORDERED THAT** defendants must reinstate plaintiff to the position of Major within the KHP, consistent with this Memorandum and Order.

**IT IS FURTHER ORDERED THAT** defendants' oral Rule 52 motion is denied.

**IT IS SO ORDERED.**

**Dated this 12th day of July, 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
